ANDERSON, Master, etc., and others *v.* THE EDAM, etc.

DUNSCOMBE, Master, etc., and others *v.* SAME.

*(District Court, E. D. New York. July 27, 1882.)*

1. SALVAGE—SUCCESS AN ESSENTIAL ELEMENT.
    Where services rendered were not successful, the claim for salvage will not be allowed; success being the essential element of a salvage service, and its absence fatal to a claim for compensation.

2. SAME—VALUE OF PROPERTY AN ELEMENT.
    Although salvage compensation is not awarded by any fixed rate of commission on the value of the property saved, yet the value of the property saved is an element to be taken into account when making up a salvage reward.

3. SAME—FOREIGN VESSELS—WHAT LAW GOVERNS.
    In a case of a salvage service performed by a British vessel in rescuing a Dutch vessel, neither the Commercial Code of the Netherlands, nor the practice of the English courts, furnishes the law for the American courts of admiralty; and those courts, when not fettered by statute, administer the maritime law upon a consideration of those principles which have obtained general recognition among maritime nations, and are justly applicable to all ships that sail the seas.

4. SAME—COMPENSATION—LIBERAL REWARD.
    The greatness of the peril from which the salved vessel was rescued; the fact that, if she had not been taken in tow by the salving vessel, she would most likely have drifted into the same dangerous locality from which she had

barely escaped; and the facts that the master of the salving vessel had abandoned his own voyage, and that by the service rendered he had brought the salved vessel into her port of destination, and relieved a large number of passengers from peril,—make up. a case meriting a liberal reward.

*Butler, Stillman & Hubbard,* for libelants.

*P. J. Joachimssen,* for respondent.

BENEDICT, D. J.   These two actions are brought—one by the master and owners of the steam-ship Persian Monarch, and the other by the master and owners of the steam-ship Napier—to recover salvage compensation for services rendered to the Dutch steamer Edam.   They were tried together by consent.   The following are the facts:

The steamer Edam, laden with a cargo and passengers, left Rotterdam, bound for New York, on the first day of January, 1882.   On the fourteenth of January, in latitude 43 deg. N. and longitude 58 deg. 30 min. W., she lost all the blades of her propellor.   Sails were then set, and she proceeded for seven days under sail with signals of distress flying.   One steamer of the Hull line passed by in plain sight without stopping, although informed by gun and signal that the Edam required immediate assistance.   On Saturday, January 21st, when about latitude 40 deg. 36 min. and longitude 68 deg. 50 min. W., the steam-ship Persian Monarch, a powerful steamer, bound to the westward, fell in with the Edam, and at her request took her in tow.   The weather was then fine, but by midnight it blew a gale, with a heavy sea.   On Sunday morning the hawser parted in the increasing gale.   Efforts to regain the hawser were made during Sunday without success.   During Sunday night the Persian Monarch lay by, exchanging signals with the Edam until 3:15 on Monday morning.   After that the Edam was lost sight of.   Efforts to find her were kept up by the Persian Monarch until 1:30 P. M. on Monday, when the hope of finding her was abandoned, and the Persian Monarch took a course for New York, where she arrived on Tuesday.   Upon arrival the agents of the Edam were informed by the master of the Persian Monarch how and where the Edam had been left, and he held consultations with the officers of a revenue cutter, which the agents of the Edam procured to be dispatched from New London in search of her, and he also prepared charts to aid the cutter in her search, which search proved to be vain.

The Edam, when lost sight of by the Persian Monarch on Monday morning, was some 65 miles south-west of Nantucket shoals, powerless to hold any course, and drifting to the north-east.   The weather was cold, and some of her crew became frost-bitten.   Her decks were covered with ice.   The sea continued high, she rolled heavily, and some of her sails were blown away. By noon on Monday she was among the breakers on Nantucket shoals.   The small boats were made ready and life-preservers distributed among the passengers.   She passed near dangerous breakers in 12 fathoms of water, and once actually touched, after which the leak increased,   At 2 o'clock she passed between the shoals and the Davis light-ship, nearly 70 miles from where she had been left by the Persian Monarch.   She drifted until morning to the south-

ward without control of her movements, steering in one direction while she drifted in another, her sails only steadying her. On Tuesday the gale and sea moderated, but the drifting of the steamer to southward continued. On Wednesday the sea was smooth, the wind light, from the south-east, and the Edam on the inner edge of the Gulf stream, 180 to 200 miles E. by S. $\frac{1}{2}$ S. from Sandy Hook, 60 miles S. from Nantucket shoals, some 80 miles S. E. from where the Persian Monarch had left her, and S. of the usual track of steamers bound in or out of New York, when at about 8 A. M. she was discovered by the steam-ship Napier, an iron steam-ship of 1,927 tons, bound from New York to London, which had happened to take a more southerly course than is usually taken by out-going steamers. When the Edam was discovered by the Napier she had flying from her mainmast the signal " Want immediate assistance," and from her foremast the signal "Will you take me in tow?" The Napier ran down to her, and, in answer to her signals, replied that she would tow her to Halifax. The master of the Edam then went on board the Napier, and, with great earnestness, entreated the master of the Napier to tow him to New York, representing the perils he had encountered on the shoals, the disabled condition of his vessel, and the danger of his being wrecked on the shoals, in case of storm, while being towed towards Halifax. After much hesitation, arising from his unwillingness to return to the coast, the master of the Napier consented to endeavor to get the Edam to New York, upon the agreement that the compensation for the service should be determined in London by arbitration.

At 11 A. M. on Wednesday the Napier commenced to tow the Edam by a hawser fastened around her mainmast. Her speed, with the Edam in tow, was six knots an hour, having before been eight and one-half knots. About 6 o'clock on Wednesday the weather changed, a strong wind came up from the south, increasing to a gale, with sleet and rain. The sea set strong from the S. W., and at 10 o'clock was very boisterous, washing over the Napier. All hands on board the Napier, in all departments, stood watch through the night. The crew stood by the hawser, watching it and parcelling it. The strain was so severe that the heaving hawser was brought from the forepeak to be used in case of need. There was six hours' hard work, amid exposure from the sleet and rain and cold, in handling the hawser. The gale became so strong and the sea so high that the Napier could make but between two and three knots an hour, and abandoned her course to head more to the sea. Thursday morning the gale abated somewhat, but the sea continued heavy throughout the day and night with the wind from the S. W. At 6 P. M. thick fog set in and heavy rain, and at half-past 8 P. M. the Napier, having run her distance to Sandy Hook, headed to wind and put her engines dead slow to keep her position until the fog should lift. During the night the fog lifted and the Highland lights appeared bearing about N. W., distant about 15 miles. The Napier steamed slowly for the Hook, the sea running high, with strong ebb-tide, and between 10 and 11 o'clock Friday morning she left the Edam safely at anchor off Hoffman's island. The Napier was obliged to procure fresh coals before she could resume her voyage. She ordered them on Friday, but could not get them until Monday. On Tuesday she sailed again for London, just a week from the date of her original departure.

The Edam was a new steamer, built at a cost of $226,525. Her cargo was worth $220,000. On her arrival in New York she had on board coals, stores, and provisions worth $4,300. Her freight for the voyage amounted to $6,500, her passenger money to $3,080. She had on board a crew of 52 persons, all told, and 146 passengers, 35 of whom were children.

The value of the Napier was $160,000; her cargo was worth $98,750. Her crew numbered 25, all told. In saving the Edam she incurred expenses amounting to $1,134.56, $422.06 of which was for insurance of the cargo from New York to London after her return to New York with the Edam. She was detained seven days.

The underwriters on the Edam having refused to assent to a determination of the amount of the Napier's compensation by an arbitration in London, the above-entitled action was commenced in her behalf, and also an action in behalf of the Persian Monarch. In both actions the claim is for salvage.

The claim of the Persian Monarch will be first considered. It seems plain to me that this claim must be wholly disallowed, upon the ground that the services rendered by the Persian Monarch were not successful. The contention in behalf of the Persian Monarch is that her failure to bring the Edam into port is important only in measuring the amount of the reward. I do not so understand the law. On the contrary, success has always been held to be an essential element of a salvage service, and its absence fatal to a claim for salvage compensation. I am aware of decisions holding that, in case of a continuous peril, all vessels whose exertions contributed directly to the final rescue may share in the reward. Such was the case of The Island City, 5 Blatchf. 264. Also of decisions holding that exertions which have secured the only chance of salvation to a vessel otherwise certain of destruction may be rewarded when it appears that, by means of the chance so afforded, and not otherwise, final safety was attained. Such was the case of The E. U. Spinks, 63. Also of decisions allowing salvage for bringing property into a condition whereby a part of it was saved by the subsequent exertions of others. Such was the case of The Samuel, 15 Jur. 407. But the case of the Persian Monarch differs from all of these, and I know of no authority that will sustain her claim. Undoubtedly, her exertions in behalf of the Edam were meritorious, but her services were completely terminated and all connection with the Edam ended by a peril of the sea before safety was secured. Nothing that the Persian Monarch did after her hawser parted, and nothing that she had done before, tended in any degree to the subsequent rescue of the Edam by the Napier. She neither brought the Edam to the place where the Napier took hold of her, nor conducted her to a place of safety.

On the contrary, by the misfortune which befell both vessels when the hawser of the Persian Monarch parted, the Edam was placed in greater danger than she was when the Persian Monarch began to tow her. Subsequent events show this. The services of the Persian Monarch did not save the Edam, nor tend to save her; but, as it happened, only brought upon her a new peril by placing her where she was in great danger of destruction on the shoals, in the neighborhood of which, during thick weather, she had been brought when the hawser parted. A new disaster fell upon the Edam when the hawser parted and the Persian Monarch was lost sight of, out of which arose new and different dangers. From them she escaped, it is true, but her escape is not in the slightest degree attributable to the exertions of the Persian Monarch. My conclusion, therefore, in regard to the action brought by the Persian Monarch, is that it cannot be maintained. The libel in that case will therefore be dismissed, and with costs.

In regard to the claim of the Napier, which forms the subject of the second action above named, it is conceded on the part of the Edam that the Napier is entitled to salvage compensation. The only dispute is in regard to the amount. No tender of any amount has been made in behalf of the Edam. She has expressed a willingness to pay a reasonable amount, and on the argument the suggestion was made that $1,000 would be reasonable and proper. The Napier asked for $30,000.

In behalf of the Edam it has been contended that the old method of giving percentage on the value of the property saved is obsolete. No doubt it is true that salvage is not awarded according to any fixed rate of commission, but now, as always, the value of the property saved is an element to be taken into account when making up a salvage award. Again, it is contended that because the Edam is a Dutch vessel the rule of the commercial code of the Netherlands must be applied, according to which, as it seems, any consideration of the danger from which the property is rescued is prohibited except when the property saved is derelict. But while the Edam is a Dutch vessel the Napier is not. She is a British vessel, and by the same rule may invoke the decisions of the English courts, where not only is the peril of the property rescued considered in all cases, but, as is well known, the present leaning is towards very liberal rewards in case of relief afforded by one steamer to another steamer disabled. And what is more, the Napier may invoke the agreement made by the master of the Edam at the time of securing the service of the Napier, that the compensation should be fixed by arbitration in London,

where, as it may be presumed, the amount would have been upon the liberal scale which the English admiralty courts have felt forced to adopt in cases of this description.

But neither the commercial code of the Netherlands nor the practice of the English courts furnishes the law for the American courts of admiralty in cases of this description. Those courts, when not fettered by statute, administer the maritime law upon a consideration of those principles that have obtained general recognition among maritime nations, and are justly applicable to all ships that sail the seas. It cannot, therefore, be doubted that the Napier is entitled to ask this court, on fixing the amount of her reward, to consider the value of the Edam and her cargo, and likewise the danger to which she was exposed when taken hold of by the Napier. The greatness of that peril is disclosed by the strenuous objection made by the master of the Edam to being towed towards Halifax, by what had happened to the Edam between the time when the Persian Monarch lost sight of her and the time when she fell in with the Napier, and by the fact that, as the weather proved to be, the Edam, if she had not been taken in tow by the Napier, would most likely have drifted into the same dangerous locality from which she had already once barely escaped. It is also to be noticed that the Edam, when fallen in with by the Napier, was out of the ordinary track of steamers bound in and out of New York; that the master of the Napier, in compliance with the entreaties of the master of the Edam not to take him towards Halifax, but to New York, abandoned his own voyage and returned to a dangerous coast in a stormy month of a winter, remarkable for its severity; that by so doing he brought the Edam to her port of destination and relieved a large number of passengers from peril, the extent of which is disclosed by the fact that the agents of the Edam, on hearing of her abandonment by the Persian Monarch, procured to be dispatched in search of her a revenue cutter, that could hope to save lives, but nothing else.

Looking at all the circumstances, and mindful of the numbers whose lives and happiness are constantly at risk in the steamers plying between the Atlantic shores, of which a large and constantly-increasing portion are, in case of failure in their machinery, wholly dependent for safety upon the voluntary aid of other steamers; mindful, also, of the policy upon which the doctrine of salvage rests,—it appears a duty owing by the courts of admiralty towards the public to give, in cases like the present, a reward sufficiently liberal to induce the master of any steamer to overcome all unwillingness to assume

additional labor, to put aside his desire to make a direct and quick passage, even to disregard the express instructions of his owners, in favor of the request of another steamer disabled at sea to be towed to a place of safety.

Upon these considerations I award to the Napier a salvage compensation of $25,000, to be distributed among the owners, officers, and crew as follows: Out of the sum awarded, the amount actually disbursed by the Napier in performing the services, viz., $712.50, is to be first deducted and paid to the owners of the Napier. Three-fourths of the remainder is to be then paid to the owners of the Napier as their share of the salvage award. The master of the Napier is to receive the sum of $2,500, and her chief officer the sum of $650. The remainder is to be divided among the other officers and crew in proportion to their respective rates of wages—the volunteer third officer to be rated at £5 per month.

Let it be referred to the commissioner to ascertain the names and wages of the crew, and report the amount to be decreed each person, in accordance with this opinion.

---

### Equity—Jurisdiction—Dismissal—Remedy at Law.

MITCHELL, Adm'r, v. DOWELL and others, and the same parties e converso, U. S. Sup. Ct., Oct. Term, 1881. Cross-appeals from the same decree and on the same record, from the circuit court of the United States for the eastern district of Arkansas. The decision was rendered by the supreme court of the United States on May 8, 1882. Mr. Justice *Woods* delivered the opinion of the court, reversing the decision of the circuit court, and remanding the cause, with directions to dismiss the bill.

Where a cause of action cognizable at law is entertained in equity, on the ground of some equitable relief sought by the bill, which it turns out cannot, for defect of proof or other reason, be granted, the court is without jurisdiction to proceed further, and should dismiss the bill and remit the cause to a court of law.

Clark & Williams, for Mitchell.

W. F. Henderson and A. H. Garland, for Dowell.

Cases cited in the opinion: Russell v. Clark, 7 Cranch. 69; Price's Pat. Candle Co. v. Bauwen's Pat. Candle Co. 4 Kay & J. 727; Baily v. Taylor, 1 Russ. & M. 73; French v. Howard, 3 Bibb, 303; Robinson v. Gilbreth, 4 Bibb, 184; Nourse v. Gregory, 3 Litt. 378.

### Appeal—Taken in Time.

BRANDRES and others *v.* COCHRANE and others, U. S. Sup. Ct., Oct. Term, 1881. Appeal from the circuit court of the United States for the northern district of Illinois. On motion to dismiss because the appeal was not taken within two years after entry of decree. The decision was rendered by the supreme court of the United States on March 13, 1882. Mr. Chief Justice *Waite* delivered the opinion of the court, denying the motion.

Where complainants prayed an appeal on the day the decree was entered, which was allowed upon their giving bond according to law, and on the day before the expiration of the two years the circuit judge approved a bond for an appeal and signed a citation, which were filed with the clerk, and afterwards entered an order allowing the appeal *nunc pro tunc,* as of the date of approval of the bond, the taking of the security and the signing of the citation were an allowance of the appeal, and no formal order of allowance was necessary, and the appeal was taken in time.

John S. Mont, for appellants.

Edwin F. Bailey, for appellees.

Cases cited in opinion: Sage v. Railroad Co. 96 U. S. 714; Draper v. Davis, 102 U. S. 371.

### Appeal—Matter in Dispute.

RUSSELL *v.* STANSELL, U. S. Sup. Ct., Oct. Term, 1881. Appeal from the district court of the United States for the northern district of Mississippi. The decision was rendered in the supreme court of the United States on March 13, 1882. Mr. Chief Justice *Waite* delivered the opinion of the court, dismissing the appeal for want of jurisdiction.

Where several land-owners are assessed by court commissioners, each for small sums, and each liable only for his own assessments, the matter in dispute, as regards their right of appeal, is the separate amounts assessed to each, and not the aggregate amount; and the distinct and separate interests cannot be united for the purpose of making up the necessary amounts to give jurisdiction on appeal.

H. T. Ellett, for appellees.

Cases cited: Paving Co. v. Mulford, 100 U. S. 148; Seaver v. Bigelow, 5 Wall. 208; Rich v. Lambert, 12 How. 347; Stratton v. Jarvis, 8 Pet. 41; Oliver v. Alexander. 6 Pet. 143.

### Damages—Province of Jury.

CITY OF MANCHESTER *v.* ERICSSON, U. S. Sup. Ct., Oct. Term, 1881. Error to the circuit court of the United States for the eastern district of Virginia. The controversy in this case was on the question whether the city or a bridge company was responsible for the condition of the street in such a manner as to incur liability for negligence in the care of it. The decision was rendered in the supreme court of the United States on April 17, 1882. Mr. Justice *Miller* delivered the opinion of the court, reversing the judgment of the circuit court, and remanding the cause, with instructions to grant a new trial.

The fact that the city owned stock, and had advanced money to the corporation which held the title to the bridge, does not make the city responsible

for defects in the approaches to the bridge, but whether the city by its action had treated the embankment as a street, or an extension of a street, is a question of fact for the jury.

P. Phillips, W. A. Maury, and C. C. McCrae, for plaintiffs in error.

C. V. Meredith and G. K. Macon, for defendant in error.

## Practice.

HITCHCOCK *v.* BUCHANAN and another, U. S. Sup. Ct., Oct. Term, 1881. Error to the circuit court of the United States for the southern district of Illinois. The decision was rendered by the supreme court of the United States on April 10, 1882. Mr. Justice *Gray* delivered the opinion of the Court.

Where a bill of exchange was manifestly a draft of a company and not of the individuals by whose hands it is subscribed, and it purports to be made at the office of the company, and directs the drawees to charge the amount thereof to the account of the company, of which the signers describe themselves as president and secretary, will not bind the agents personally.

Thomas G. Allen, for plaintiff in error.

Charles W. Thomas, for defendants in error.

Cases cited: Sayre v. Nichols, 7 Cal. 535; Carpenter v. Farnsworth, 106 Mass. 561; Dillon v. Bernard, 21 Wall. 430; Binz v. Tyler, 79 Ill. 248.

## Duties on Imports.

HENRY *v.* FIELD and others, U. S. Sup. Ct., Oct. Term, 1881. Error to the circuit court of the United States for the western district of Illinois. The decision was rendered on March 20, 1882, in the supreme court of the United States. Mr. Justice *Field* delivered the opinion of the court, approving the judgment of the circuit court.

"White linen torchon laces and insertings" are "thread lace and insertings," and are liable for duties only to the amount prescribed for articles of that kind; and are not classed as a manufacture of flax, or of which flax is the component material or chief value, "not otherwise provided for."

S. F. Phillips, Solicitor General, for plaintiff in error.

John H. Thompson and Edward S. Isham, for defendants in error.

## Practice—Bill of Exceptions—Internal Revenue.

UNITED STATES *v.* RINDSKOPF and others, U. S. Sup. Ct., Oct. Term, 1881. Error to the circuit court of the United States for the eastern district of Wisconsin. The decision in this case was rendered in the supreme court of the United States on April 24, 1882. Mr. Justice *Field* delivered the opinion of the court, reversing the judgment, and remanding the case for a new trial.

Only such parts of the charge of the court should be given as would point the exceptions; and, so, inserting the entire evidence in the record is objectionable practice. The assessment of the commissioner of internal revenue is only *prima facie* evidence of the amount due as taxes upon distilled spirits. If not impeached, it is sufficient to justify a recovery; but every material fact upon which liability is asserted is open to contestation. An instruction that the assessment is to be taken as an entirety, and that the government is enti-

tled to recover the exact amount assessed, or not any sum, is erroneous, unless an erroneous rate has been adopted by the officer, or where it is impossible to separate from the property assessed the part which is exempt from the tax, or where its validity depends upon the jurisdiction of the commissioner.

S. F. Phillips, Solicitor General, for plaintiff in error.

J. B. C. Cottrell, L. Abraham, and C. E. Mayer, for defendants in error.

Case cited as to practice: Lincoln v. Laflin, 7 Wall. 137.

### Patents—Novelty and Utility.

LEHNBENTER v. HOLTHAUS, U. S. Sup. Ct., Oct. Term, 1881. Appeal from the circuit court of the United States for the eastern district of Missouri. This case was decided in the supreme court of the United States on March 6, 1882. Mr. Justice *Woods* delivered the opinion of the court, reversing the decision of the circuit court, and remanding the cause for further proceeding. A patent, as against a party proved to have infringed it, is *prima facie* evidence of both novelty and utility.

### Obstruction to Navigation.

ST. LOUIS v. THE KNAPP Co., U. S. Sup. Ct., Oct. Term, 1881. Appeal from the circuit court of the United States for the eastern district of Missouri. The case was decided in the supreme court on March 4, 1882. Mr. Justice *Harlan* delivered the opinion of the court, reversing the judgment, and remanding the case for further proceedings according to law.

A public navigable stream must remain free and unobstructed, and no private individual has a right to place permanent structures within the navigable channel; and if a proposed run-way, when completed, proves to be a material obstruction to the free navigation of a river, or a special injury to the rights of others, it may be condemned and removed as a nuisance. Where the complaint avers that defendant proposes to do the act, and the averment is accompanied by the general charge that "the driving of piles in the bed of the river and the construction of the run-way will not only cause a diversion of the river from its natural course, but will throw it east of its natural course, from along the river bank north and south of the proposed run-way and piling," it is a sufficiently certain and minute allegation of facts, and not a case of a threatened nuisance only, and is not demurrable on the ground of uncertainty. In most cases general certainty is sufficient in pleadings in equity, and where the pleading distinctly apprises the defendant of the precise case the pleading is sufficient.

Leverett Bell, for appellant.

J. M. & C. H. Kram, for appellee.