## THE STRATHNEVIS.

### CANADIAN-AUSTRALIAN S. S. LINE v. THE STRATHNEVIS.

### PACIFIC IMP. CO. et al. v. SAME.

(District Court, D. Washington, N. D. November 2, 1896.)

### Nos. 971, 972.

1. SALVAGE—WHEN PAYABLE—SUCCESSFUL EFFORT.
   To earn salvage, success must crown the efforts of the salvors. But, when a vessel has been actually rescued from a situation of peril, all who have contributed at any stage of the rescuing services are entitled to a share of the reward.

2. SAME—ABANDONMENT OF UNDERTAKING.
   Voluntary abandonment of an attempt to rescue a vessel in peril works a forfeiture of the right to salvage. But when salvors are prevented by stress of weather, fog, or darkness, or other circumstances beyond their control, from rendering further assistance, and there has been no willful disregard of duty on their part towards the imperiled ship, there should be no forfeiture.

3. SAME—FORFEITURE—REDUCTION OF COMPENSATION.
   The amount of salvage to be awarded should be commensurate with the merit of the salvor's conduct; and when salvage has been earned, and there has been no willful misconduct or neglect, mere failure on the part of salvors to do all that might be done under the circumstances affords good ground for reducing the amount to be awarded, but there is no inflexible rule making forfeiture the penalty.

4. SAME—MEASURE OF COMPENSATION.
   Where a disabled steamship, without motive power, and with one anchor lost, was found, during tempestuous weather, at anchor on the lee shore of an island, flying a distress signal, and was rescued with great difficulty and danger by a steamship, and the loss of four days' time, held, that the steamship found was in imminent peril, and being worth, with her cargo, freight, etc., $220,000, while the salving vessel was worth $216,000, an award of $12,000 to her owners, $1,800 to her captain, and amounts varying from $600 to $100 to her officers and crew, was just and reasonable. The Sirius, 6 C. C. A. 614, 57 Fed. 851, followed.

5. SAME—FORFEITURE—CONTRIBUTING TO RESCUE.
   The steamship M. found the steamship S. disabled, in a perilous situation, far from land, and out of the track of inward-bound steamships, at a season when bad weather prevailed, and attempted to tow her into port. After proceeding a considerable distance, and getting in the usual track of

other vessels, the towline parted during a storm at night, and the vessels separated. In the morning the M. searched for the S. for several hours, but finally abandoned all hope of finding her, and proceeded on her course. The S. was found and brought into port by another steamship. *Held,* that the fact that the rescue was completed by another vessel did not work a forfeiture of the M.'s claim for salvage.

6. Same.

Where a steamship which had become separated from, and was unable to find, a disabled vessel she was attempting to save, proceeded on her course without giving notice at a telegraph station less than 50 miles off, *held,* that this fact would very materially reduce the salvage allowed her, the vessel having been finally rescued by another steamship.

These were libels by the Canadian-Australian Steamship Line and by the Pacific Improvement Company, owner of the steamship Mineola, and A. F. Pillsbury, master of said vessel, against the British steamship Strathnevis.

Struve, Allen, Hughes & McMicken, for Canadian-Australian S. S. Line.

L. C. Gilman and Duncan G. Inverarity, for Pacific Imp. Co. and others.

J. M. Ashton and D. J. Crowley, for claimant.

HANFORD, District Judge. These cases are full of interest, because of the important questions presented for consideration, as well as for the story of hardships endured, heroic efforts to save, and the final rescue of, a valuable ship and cargo, and the lives of a large number of persons, constituting her ship's company and passengers. That story, briefly told, is as follows:

On the 12th day of October, 1895, the steamship Strathnevis, an English merchant vessel, left Tacoma with a cargo of 3,000 tons of flour and miscellaneous merchandise, of the value of $55,000, and 129 passengers, and a crew of 30 persons, bound on a voyage to the city of Yokohama. She touched at Victoria, and there took on other passengers, making the total number 165. On the seventh day out from Victoria, in latitude 49° 14′ N., and longitude 164° 27′ W., and distant about 1,600 miles from Cape Flattery, in a heavy northwest gale, her propeller shaft broke between the stern post and boss. It was a clean break, the propeller being completely severed from the vessel and lost in the sea, depriving the vessel of all use of her propelling machinery, and leaving her destitute of motive power, except the wind. The Strathnevis is a first-class steel steamship, of 3,574 tons registered gross tonnage, and 2,305.56 tons net. Her dimensions are 350 feet keel, 43 feet beam, 27 feet depth; her engines are 1,500 horse power; and her carrying capacity is about 6,000 tons. She was built for a cargo ship, but had been fitted for the accommodation of passengers, and was, at the time referred to, employed as one of the vessels of the Northern Pacific Steamship Line, from Tacoma to Hong Kong, via Victoria and Yokohama. She carried five small sails, which, with two others improvised after the accident, made a total spread of canvas of less than 1,000 yards. In her disabled condition, and with her inadequate facilities for sailing, she battled with tem-

pestuous weather, making slow progress towards the coast from which she had last departed, for 59 days, when, in latitude 43° N. and longitude 132° W., and distant about 500 miles from Cape Flattery, she was met by the English steamship Miowera, of the Canadian-Australian Steamship Line, bound on a voyage from Victoria, via Honolulu and Fiji Islands, to Sydney, Australia. At that time the Strathnevis was short of provisions of almost every kind, except flour and salmon, which constituted the bulk of her cargo. Her officers and crew were worn and dejected, and she was flying signals of distress, signifying that she was disabled, and wished to be taken in tow. As soon as the vessels came sufficiently near together, she sent her first officer on board the Miowera, commissioned by her master to arrange with the master of the Miowera for the assistance required. After partaking of refreshments, this officer gave a brief account of the experiences of the Strathnevis, and obtained the consent of the Miowera's captain to turn back and make the attempt to tow the Strathnevis to Victoria, which was the nearest port of safety under the British flag, and also obtained a quantity of provisions and ship's stores, which were sent in boats to the Strathnevis. At this time the weather and sea were moderate, and the Miowera, with commendable promptness, took the Strathnevis in tow, and started for Victoria. The start was made at 12:30 p. m. on December 18, 1895. Soon afterwards the barometer began falling rapidly, the wind freshened, the sea became rough, and the weather became thick, with drizzling rain. The same state of weather continued, and became even more tempestuous, until the vessels finally separated. At 25 minutes past midnight on the morning of December 19th, the towline, a steel-wire, 4½-inch hawser, 90 fathoms in length, shackled to about 45 fathoms of cable chain, was broken by the heavy strain, and the irregular movements of the heavy vessel in tow as she was rolled and plunged by the force of the stormy sea. It was necessary to wait for daylight before any attempt could be made to again connect the two vessels, and it was then found to be extremely difficult, on account of the high waves and squally weather. The whole day was spent in ineffectual efforts. Repeated efforts to secure a line from one vessel to the other by means of a float failed, on account of the heavy, cross-running sea, and the danger of a collision if the vessels approached too near each other. Late in the afternoon a line was picked up, but, before a hawser could be drawn from one vessel to the other and shackled, the hauling line was parted by the rolling and pitching of both vessels, and it became necessary to again wait for daylight of another day. The first part of next day was spent in similar efforts, with like difficulties and failure, and at 12:30 p. m. the Miowera signaled to the Strathnevis, "Will send a boat," and a boat with a volunteer crew was accordingly sent; the officers and seamen constituting the volunteer crew exposing themselves to great peril, and being obliged to perform most exhausting labor. At last, during the afternoon of December 20th, success attended their efforts, and the vessels resumed their journey towards Vic-

toria; the Strathnevis being held in tow by two lines, a 12-inch manilla hawser, and a 4-inch steel-wire hawser, shackled to the port and starboard cables, respectively, of the Strathnevis. Extraordinary vigilance and prudence characterized the conduct of the officers and crew of the Miowera in running her engines and regulating her speed, and in steering her courses, and in keeping lookout, and in watching the hawsers, so as to succeed, if possible, in making port while the towlines lasted. They reached a point only about 40 miles distant from Cape Flattery, when, on account of the fierce westerly gale, it became too hazardous to continue running in the same direction as the wind, towards the coast, and it became necessary to come around so as to head towards the sea. At this time, the gale was extremely fierce, and the sea was running high, causing the vessels to roll and plunge with tremendous force. The weight of the tow bore heavily, causing the stern of the Miowera to bury into the sea to a depth of six feet. Some of her skylights were broken, tarpaulin coverings were stripped from her hatchways, and a great deal of damage was done about the deck. Quantities of water forced its way through the various openings in the deck and the stoke hole, flooding her cabins and engine room. The witnesses testify that the Strathnevis was rolling so that, from the Miowera, her colored lights appeared at times to be almost perpendicular, one above the other. Between 12 and 1 o'clock on the morning of December 23d, when distant about 63 miles from Cape Flattery, the towlines were again broken, and at 4 o'clock a. m. the vessels lost sight of each other. The Miowera waited until daylight, and then steamed in the direction in which it was supposed the Strathnevis drifted, if she had not foundered. She continued to search for the Strathnevis until about 1 p. m., when, her captain supposing that it would be unsafe to approach nearer to land, and that he had steamed a greater distance than the Strathnevis would have drifted, were she still afloat, he again changed his course and headed towards the sea. At 4 o'clock p. m. he abandoned all hope of finding the Strathnevis, or of being able to do anything for her people; and, although he was then not more than 50 miles distant from a telegraph station just inside the entrance to the straits of Juan de Fuca, he steamed away on his course for Honolulu. The next day at noon she had logged 248 miles, and a few minutes later her engines stopped; and, according to the engineer's log, an examination then made showed that one valve and several other small pieces of her machinery were broken. Repairs were made, and at 5:50 p. m. she started ahead full speed, and proceeded to Honolulu without any other important occurrence. According to the captain's testimony, he was apprehensive of trouble from her engines giving out at the time of abandoning search for the Strathnevis, and he deemed it necessary to run far out to sea for safety. It does not appear, however, that any inspection of the machinery was made until after the engines stopped working, as above noted.

The Strathnevis was driven before the gale until she came within seven miles from Destruction Island, where she dropped an anchor

in 35 fathoms of water.    Not only the anchor, but all the cable to
which it was attached, went overboard and was lost.    A second
anchor was then cast, and it held her until she was taken in tow, and
finally rescued by the steamship Mineola.    The Mineola is an Amer-
ican steamship, and she was then on a voyage from Tacoma to San
Francisco, carrying a cargo of 3,400 tons of coal and a crew of 32
officers and men.    On the morning of December 24th she found the
Strathnevis at anchor on the lee shore of Destruction Island, flying
a signal of distress, indicating that she was disabled and wished to
be towed into a port of safety.    The storm had at that time mod-
erated so that but little delay was experienced in sending a towline
from the Mineola to the Strathnevis, and, the Mineola being better
supplied than the Miowera with facilities for handling a heavy tow,
she was able to, and did, bring the Strathnevis safely into the harbor
of Port Townsend.    The rescue was timely, and it was accomplished
amid difficulties and peril.    After leaving Tacoma the machinery of
the Mineola was found to be not in perfect working order, and her offi-
cers, in undertaking the heavy task of towing the Strathnevis, were
conscious of the risk of running into fatal danger if her machinery
should break down.    From about 8 p. m., and during the remainder
of the night of December 24th, very severe weather prevailed off
Cape Flattery and Destruction Island.    The vessels rounded Cape
Flattery at about 11:50 a. m. on the 25th.    In the straits the wind
and sea continued to increase, and the weather became thick with
continuous rain, so that it was difficult for the master of the Mineola
to determine or keep his position.    It was the intention to take the
Strathnevis to Royal Roads, and as she then had on board but one
anchor cable, which was in use to lengthen the towline, a stop was
made for the purpose of unshackling the cable from the hawser so
as to get in readiness for anchoring.    When the chain had been un-
shackled, and the hawser of the Mineola made fast to the Strath-
nevis, the increasing wind and sea caused the master of the Mineola,
with the consent of the master of the Strathnevis, to abandon the
purpose of going to Royal Roads, and to run for Port Townsend, in-
stead, which, from the position in which the vessels were, could be
reached with less danger.    An additional strain was put upon the
towline, in bringing the Strathnevis around into her proper course,
as she had been drifting side to the wind and sea at the time of with-
drawing her cable; and, after towing ahead about 30 minutes, the
hawser parted, and the Strathnevis commenced to drift towards
Race Rocks.    In order to save her, it was necessary for the Mineola
to run close under the lee of the Strathnevis, and lower a boat into
the raging sea.    In doing this, one of the boat's crew was thrown
into the water, and was in jeopardy for some 15 minutes.    The boat
succeeded in reaching the Strathnevis, and the second officer of the
Mineola went on board the Strathnevis, and assisted in taking in the
hawser and passing a line back to the Mineola, by means of which
the hawser was drawn on board, and connection between the two
vessels re-established.    While this work was being done, the Mine-
ola lay in a heavy sea,—sometimes head to the sea, and sometimes
in the trough of the sea.    After the hawser had been made fast to

the Mineola, she. proceeded with the Strathnevis in tow, and succeeded in reaching Port Townsend at about 9 o'clock in the evening of December 25th. For the service thus rendered, in taking the Strathnevis from a position of danger to a port of safety, the master and owner of the Mineola, in behalf of themselves and the officers. and crew of the Mineola, claim a suitable reward. The answer of the claimants admits that libelants are entitled to salvage, and the only question to be determined by the court is as to the amount that should be allowed.

It is established by the evidence, beyond question, that the master, officers, and crew of the Mineola were prompt in rendering assistance to the Strathnevis, and that they displayed the very highest degree of courage and seamanship. Their undertaking was perilous, and involved arduous labor, which was skillfully performed, and resulted in complete success. The value of such service cannot be fairly measured by the ordinary contract rates for towage services performed by vessels in the business of towing. The Mineola was not in commission as a tugboat looking for such employment, although she was fortunately equipped with towing bits and other appliances, which were useful on this occasion. I must find from the evidence that the Strathnevis was in a position of imminent peril when the Mineola found her. The testimony to the contrary given by her commander and other witnesses is, in my estimation, completely overcome by the evidence of the signals flying from the masts of the disabled vessel at that time, and the indisputable facts that, being without motive power to render her manageable in such a position, and with one anchor lost, and tempestuous weather prevailing, she was lying at anchor on the lee shore of Destruction Island.

I find the value of the property saved to be, according to a preponderance of the evidence, as follows:

Value of the Strathnevis...................................................$150,000
Value of her cargo........................................................ 55,000
Value of freight and passenger money..................................... 15,000

Total value.............................................................$220,000

By the undisputed evidence, it is shown that the value of the Mineola, her cargo and freight, amounted to $216,850. The time of the Mineola consumed by the deviation from her voyage was four days, and the value thereof $2,000, and her hawser destroyed in the service was worth $600. In view of all the facts and circumstances, it is my conclusion that the following sums, as a reward for the service rendered in saving the Strathnevis, are just and reasonable, viz.:

To the owner of the Mineola.................................................$12,000
To Capt. Pillsbury......................................................... 1,800
To G. W. David, first mate................................................. 600
To Alex. Kirkwood, second mate............................................. 600
James S. Richards, chief engineer.......................................... 600
John Nelson, seaman........................................................ 300
Edward Olson, seaman....................................................... 300
Harry Fabricicous, seaman.................................................. 300
O. W. Parker, third mate................................................... 300
Charles A. Engleman, carpenter............................................. 300

Otis Doe, assistant engineer................................................ $ 300
John H. Long, second assistant engineer.............................. 300
Edward H. Waterman, third assistant engineer...................... 300
John F. Grant, steward....................................................... 200
James Richardson, cook...................................................... 200
Howard Marden, seaman...................................................... 200
D. White, seaman................................................................ 200
Arthur Christian, cabin boy................................................. 200
L. Johnson, seaman ........................................................... 100
Albert Osberg, seaman........................................................ 100
Michael McLaughlin, seaman ............................................... 100
John Finley, waiter ............................................................. 100
Thomas Koen, oiler............................................................. 100
Fred Ott, oiler.................................................................... 100
James Maddison, fireman .................................................... 100
William Carey, fireman........................................................ 100
M. Connor, fireman............................................................. 100
William Malloy, fireman....................................................... 100
M. O'Connor, fireman.......................................................... 100
David Wilson, fireman.......................................................... 100
Andrew Adamson, coal passer............................................... 100
C. A. Peterson, coal passer.................................................. 100
Fred West, coal passer......................................................... 100

In the distribution as above, I have intended to recognize special merit in Second Officer Kirkwood, and Seamen Nelson, Olson, Fabricicous, Marden, and White, and Christian, the cabin boy.

Counsel for the respective parties have cited many cases bearing upon the question as to the amount proper to be awarded as salvage. I have taken the case of The Sirius, 6 C. C. A. 614, 57 Fed. 851, as my guide, for the reason that the decision in that case was rendered by the circuit court of appeals for this circuit, and I consider it a fair decision. In that case the court awarded the total sum of $8,000, although the master of the Sirius had entered into a written contract with the master of the rescuing ship to pay $20,000. In this case the value of the property salved is considerably greater, and was in more imminent peril, the hazard incurred was greater, and the labor performed more arduous; and the master of the Mineola is entitled to higher consideration, because he went to the rescue promptly, and in a manly, generous spirit,—much to his credit, in contrast with the behavior of the captain of the Tillamook. The Sirius, however, was towed a greater distance, and the time of the service was longer. It is my opinion that the above amounts are liberal recompense, and yet reasonable, irrespective of the claim for salvage made against the Strathnevis in behalf of the owners, master, and crew of the Miowera, and the same will be decreed to be paid accordingly.

Referring now to the case of the Miowera, I find, from the pleadings and the evidence, that she found the Strathnevis in a perilous situation, far from land, and out of the track of inward bound steam vessels. With her defective sailing gear, the Strathnevis was able, at best, to make but slow progress towards any haven; and in midwinter, when storms were to be expected, she was in great danger of becoming entirely unmanageable, and of being driven ashore or upon the rocks when she approached near the coast. The Miowera rendered meritorious service in towing her to the

vicinity of comparative safety, where she was able to make soundings and find anchorage, and where she was in the track of passing vessels, from which other assistance could be obtained. This is expressly admitted in the answer. Although she did not complete her enterprise of salving the Strathnevis, her efforts were successful, to the extent of bringing the Strathnevis to the place where she was able to secure other help more speedily than she could otherwise; and, in doing so, expenses were incurred and damages were sustained; the master of the Miowera, and her officers and crew, endured hardships and braved extraordinary perils, and exposed their vessel to extraordinary hazard. Therefore I say that they were contributors to the ultimate salvation of the Strathnevis. The Miowera's claim for salvage is resisted on the ground that what she did was only an attempt to save, and she did not succeed in bringing the Strathnevis to a place of safety, and the attempt was abandoned while the Strathnevis was still in a perilous situation. And in support of their contention counsel for the claimant have cited the following authorities: The Blackwall, 10 Wall. 1–12; The Edam, 13 Fed. 135; The Aberdeen, 27 Fed. 479; The A. Anderson, 34 Fed. 925; The Golden Gate, 57 Fed. 661; The Huntsville, Fed. Cas. No. 6,916; The T. P. Leathers, Id. 9,736; The John Wurts, Id. 7,434; Abb. Shipp. p. 722; 2 Pars. Mar. Law, p. 612; The Sabine, 101 U. S. 384; The Clarita and The Clara, 23 Wall. 1–16. It is certainly true that success is essential to a legal demand for salvage. But that is true only in this sense: that property must have been actually rescued from danger. But there is no inflexible rule which bars from participation in the distribution of an award those who have toiled, incurred expense, suffered losses, and run risks, and thereby contributed towards the success of a salvage service finally completed by others. The cases are numerous in which admiralty courts in this country and in England have apportioned salvage among different sets of salvors, proceeding upon the theory that all who have contributed towards the salving of property are entitled to share in the reward. Adams v. The Island City, 1 Cliff. 210, Fed. Cas. No. 55, is a leading case of that description. The substance of the decision is as follows: The schooner Kensington fell in with a disabled bark, and, by request, took her in tow. After towing for a time, the hawser parted, and efforts to make fast again were ineffectual. The bark came to anchor, and then the Kensington left her, promising to telegraph to her owners in Boston, and to return. She did not return, but furnished information to the owners which enabled them to send the steamer Forbes to the relief of the disabled bark. The Forbes found the bark at anchor, and towed her one day, and at night left her at anchor and went away after provisions, and, returning, found the bark gone. She had been found by the steamer Western Port, bound from New York to Boston, and was by the latter vessel taken into a port. Mr. Justice Clifford rendered a decision in the circuit court awarding salvage, and apportioning it between the three vessels which were employed successively in towing the disabled bark. The following excerpt from his opinion presents

the principles upon which the Kensington was entitled to share in the reward:

"All the evidence tends to show that the peril was continuous from the first moment when the schooner went to the relief of the bark down to the time when the steamer Western Port anchored her in the port of Hyannis, in a condition so crippled and disabled by the disasters she had encountered that the service of the other steamer was indispensable to get her into Boston, where she was bound. She was in very great peril when relieved by the schooner, and was by her placed in a position of far less exposure. Those on board the schooner were prevented from doing more by the violence of the storm, and from returning to complete the service, by causes beyond their control. They rendered important service in changing her position, and in transmitting intelligence to her owners, and in giving them the opportunity of sending forward more efficient aid."

The case was appealed to the supreme court, which affirmed the decree. Cromwell v. The Island City, 1 Black, 121. In the opinion of the supreme court, by Mr. Justice Grier, it is said that:

"The peril from which the bark was finally rescued by the interposition of the Western Port was begun previous to the 23d of January, when the bark was first discovered by the schooner, and the salvage service was first commenced. The bark was in her greatest peril at that point, and was with much difficulty taken by the schooner to a place of greater comparative safety; but she was unable to put the bark in a place of absolute safety, in the port of Hyannis. The peril was not ended. The schooner, being unable to complete the rescue, gave notice by telegraph to the owners, at Boston, who dispatched the steamer Forbes to the assistance of the bark. * * * We concur, therefore, in the opinion of the circuit judge that the bark was not abandoned after salvage service commenced, that it was one continuous peril from which the bark was rescued, and that each of the several salvors contributed to the final result."

Another case in point is Cowell v. The Brothers, Bee, 136, Fed. Cas. No. 3,294. The Brothers, on her passage from Lisbon to Baltimore, had encountered a succession of dreadful tempests, reducing her to a mere wreck, so that it was difficult to keep her afloat. For three weeks the crew suffered all that human nature could endure, and two members had been washed overboard. In this situation, Capt. Cowell found them, and supplied them with provisions, when they were on the point of starvation. He offered to take them aboard his vessel if they would abandon The Brothers, but was finally persuaded to take the wreck in tow. After towing for several days, during which time the men on The Brothers were supplied with provisions by Cowell, the towline was broken a second time, after having been repaired once; and on account of the tempestuous weather it was impossible to again take the damaged vessel in tow, or for the vessels to keep together, and they soon separated, and did not again come in sight of each other. The disabled vessel drifted for nine days afterwards, when she came to anchor, and subsequently, with other assistance, was enabled to reach a port of safety. Judge Bee, in his decision awarding salvage to Cowell, said:

"The service rendered upon this occasion was as great as the crew could receive; nor is it at all probable that the vessel would have been saved by any other means. Cowell, too, risked much in the attempt; for his ship was actually injured, and the delay of towing rendered him additionally exposed to capture, and to the forfeiture of his insurance. He failed, indeed, in bringing the brig into port, but not until he had done all that was possible. He

brought her into soundings, within 90 miles of land, and the supplies she received from him enabled her crew to sustain the fatigue of nine days after the separation."

Ryan v. The Cato, Bee, 241, Fed. Cas. No. 12,184, is another case in which Judge Bee awarded salvage to a salvor who, after rendering important service, was prevented from bringing a disabled vessel into port by stress of weather. In the case of The Gary v. The Sherman, Chase, 468, Fed. Cas. No. 5,259, the facts were as follows: After the Gary had conducted the Sherman for some time, the towline parted; and it was a question in the case whether the hawser was broken, or whether it was cut by direction of the master of the Sherman, with fraudulent intent on his part to avoid liability for the service rendered by the Gary. The Sherman did not signal, and the captain of the Gary, concluding that the separation of the vessels was intentional on the part of the Sherman, made no further effort to complete the service he had undertaken. The Sherman, after proceeding for a time by her own sails, was assisted into port by another vessel. Chief Justice Chase, in deciding the case, said:

"Through the aid of the Gary, the Sherman had been rescued from danger, and brought safely a great part of the way to Charleston. Favorable winds enabled her to proceed still further without that aid, and then she found another vessel which towed her into port. Under these circumstances, I am inclined to regard this as a case of salvage, in which two vessels performed successfully the salvage services."

The recent decision by Judge Brown in the case of The Veendam, 46 Fed. 489, is in line with the decisions already referred to. In that case the steamship Veendam, in midocean, about 1,350 miles from New York and 900 miles east from Halifax, became disabled by the breaking of her shaft. The steamship La Flandre came to her assistance, in answer to signals of distress, and towed her a distance of about 191 miles, when the towline was broken; and, owing to a thick fog, it was impracticable to re-establish connection, and both vessels anchored and remained near each other until temporary repairs enabled the Veendam to proceed by her own steam. After a time the Veendam disappeared, and the master of La Flandre, concluding that she had gone ahead of him, proceeded to Philadelphia. The Veendam, by her own machinery, finally arrived at New York. In his opinion, Judge Brown says:

"I cannot doubt that the services rendered in this case were of a salvage nature, as distinguished from ordinary towage. That subject has been several times considered in this court. Such services are treated as salvage when rendered to a disabled ship with the obvious purpose of relieving her from circumstances of danger, either present or reasonably to be apprehended, and not merely to expedite her passage. The Saragossa, 1 Ben. 552, Fed. Cas. No. 12,334; The Emily B. Souder, 15 Blatchf. 185, Fed. Cas. No. 4,458; McConnochie v. Kerr, 9 Fed. 50–53; The Plymouth Rock, Id. 413–416. The sails of the Veendam were not sufficient for safe navigation in her situation. She was 900 miles from the nearest port, and, during the 12 hours before La Flandre was sighted, she made only about 1½ knots per hour under sail. Her ability to make repairs to her shaft, secure enough to proceed under her own steam power, was evidently uncertain, and could only be determined by trial, and she had 600 passengers on board. The situation was therefore manifestly one of reasonable apprehension of danger. A disabled steamer in midocean is not in a safe place, or in a safe condition. * * * It is objected that La Flandre did not tow the Veendam into port, or to a place of

safety, and that when her shaft gave out the second time she was in as much danger as at first; so that La Flandre is not legally entitled to salvage compensation, because not successful. The Edam, 13 Fed. 135; The Algitha, 17 Fed. 551: The Aberdeen, 27 Fed. 479. The principle invoked is elementary. It is applied when the ship is lost, or when the attempt to rescue her is abandoned. In the cases cited the salvors voluntarily abandoned the service. Here the ship was saved, and the service was not voluntarily abandoned. * * * It is not essential to a salvage service that the salvors should attend the vessel aided into port."

I think the above cases show how the American courts regard cases of this character, where a vessel has been found at sea in a situation of peril, and has been aided by one vessel, and her rescue has been completed by her own efforts, or by the aid of another, and the claim for salvage has been preferred by the one first to render assistance. The English courts seem to look with equal or greater favor upon claims of this character. In the case of The Atlas, Lush. 518, the facts, in brief, were as follows: The libelant found the Atlas derelict about 70 miles from the shore of England. Hawsers were made fast, and they began to tow her, and continued during that day and the succeeding night, and the salvors labored at the pumps to keep her from becoming water-logged. A steam tug offered her services to tow them into Yarmouth Roads, which services were accepted. The tide was falling, and, by persevering in the attempt to enter, libelant's vessel went aground, the hawser by which she was towing the Atlas was broken, and the Atlas went upon the beach, and they were then deserted by the tug. After waiting for the weather to become sufficiently calm, the master of the Atlas went ashore in his boat, and during his absence strangers boarded the Atlas, and brought her into harbor on the flood tide. On appeal to the house of lords, the decision of Dr. Lushington, refusing to award salvage, was reversed, and in the course of the opinion by Lord Coleridge it is said:

"That, where a salvage is finally effected, those who meritoriously contributed to that result are entitled to share in the reward, although the part they took, standing by itself, would not in fact have produced it. * * * Where success is finally obtained, no mere mistake or error in judgment in the manner of procuring it; no misconduct short of that which is willful and may be considered as criminal, and that proved beyond a reasonable doubt by the owners resisting the claim,—will work an entire forfeiture of salvage."

In the case of The Camellia, 9 Prob. Div. 28, the same rule was observed. The Camellia, an iron screw steamship, on a voyage from Baltimore to Londonderry, having broken her propeller shaft in midocean, proceeded for several days under canvass, when she fell in with the Victoria, a steamship on a voyage from Boston to Liverpool with a cargo of live stock. She was taken in tow by the Victoria, and proceeded under tow until the towline broke. She signaled to be again taken in tow, but the Victoria could not come around without great risk of damage to her cargo of cattle and sheep, and she therefore proceeded on her way after signaling to the Camellia that she would report her. The Camellia subsequently fell in with the tug Etna, and was towed to Queenstown. In a suit on behalf of the Victoria for salvage, an objection was urged that she

had improperly abandoned the Camellia. This objection was met in the opinion of the court as follows:

"I find as a fact that the Victoria did not leave the Camellia because she was unable to see that she was signaling to be again taken in tow, but because, from the nature of her cargo, she would have run a considerable risk of loss and damage to it by turning around to windward to connect the two vessels, and I am advised that this was a reasonable apprehension. * * * I think that there was no misconduct on the part of the master of the Victoria, and that, balancing the risk to the interests which were committed to his charge with that to which the Camellia was still exposed, he did not act improperly in going on when the hawser broke."

From all the authorities cited upon the argument, I deduce these principles:

First. To earn salvage, success must crown the efforts of the salvors. But, when a vessel has been actually rescued from a situation of peril, all who have contributed at any stage of the rescuing service are entitled to a share of the reward.

Second. Voluntary abandonment of an attempt to rescue a vessel in peril works a forfeiture of the right to salvage. But when salvors are prevented by stress of weather, fog, or darkness, or other circumstances beyond their control, from rendering further assistance, and there has been no willful disregard of duty on their part towards the imperiled ship, there should be no forfeiture.

Third. The amount of salvage to be awarded should be commensurate with the merit of the salvor's conduct; and when salvage has been earned, and there has been no willful misconduct or neglect, mere failure on the part of salvors to do all that might be done under the circumstances affords good ground for reducing the amount to be awarded, but there is no inflexible rule making a total forfeiture the penalty.

Application of these principles to the case in hand leads me to the conclusion that the Miowera, her master, officers, and crew, by aiding the Strathnevis in answer to her signals of distress, performed a salvage service entitling them to compensation; that they did not voluntarily abandon the Strathnevis, but by going on their course to Honolulu, on December 23d, without first going to the telegraph station at Tatoosh and reporting the Strathnevis, the master of the Miowera failed to perform an important duty, and that failure gives rise to the serious question in this case,— whether or not there has been a total forfeiture of the right to salvage. I do not accept the excuse given by Capt. Stott, which is that the machinery of the Miowera was in such a condition that it would have been imprudent to have made the run to the telegraph station. I think that idea is an afterthought, for no such reason is noted in the ship's log, nor is it mentioned in Capt. Stott's letter giving an account of his experience with the Strathnevis, written before arrival at Honolulu. I have concluded, however, out of regard for the many hours of brave and laborious efforts to save the Strathnevis, and heavy expenses and damages incurred and suffered by the Miowera, that total forfeiture is a penalty heavier than the offense deserves. I will therefore award as salvage about one-half the amount which in my judgment would other-

wise be reasonable. The Miowera and her cargo were of greater value than the Mineola, and she was in commission as a carrier of passengers as well as freight, and also employed as a carrier of the mail between the points along her route. Her deviation consumed more time than was lost by the Mineola, and she was exposed to greater hazard, and a considerably larger number of persons are entitled to share in the award than the number composing the crew of the Mineola. In view of all the circumstances, I allow the following sums:

| | |
|---|---:|
| To the owners of the Miowera | $18,000 |
| To James Stott, her commander | 500 |
| To C. W. Hay, first officer | 500 |
| To P. Smyth, chief engineer | 500 |
| To W. Anderson, second officer | 300 |
| To F. A. Hemming, third officer | 300 |
| W. Knox, carpenter | 200 |
| W. Scott, second engineer | 200 |
| J. Stewart, third engineer | 200 |
| G. Lynch, fourth engineer | 200 |
| W. W. Knowles, fifth engineer | 200 |
| H. L. Foster, sixth engineer | 200 |
| W. Morrison, seventh engineer | 200 |
| T. B. Young, purser | 200 |
| J. Scott Conklin, surgeon | 100 |
| F. Whittington, chief steward | 100 |
| E. J. Page, fourth officer | 100 |
| T. Healey | 100 |
| J. Dodge, fireman | 100 |
| J. McAverne, fireman | 100 |
| H. Mulholland, fireman | 100 |
| J. Hackett, fireman | 100 |
| C. Hassett, fireman | 100 |
| E. McCue, fireman | 100 |
| F. Kirk, fireman | 100 |
| G. Calder, fireman | 100 |
| A. Davy, fireman | 100 |
| D. Tierney, fireman | 100 |
| R. McKecknie, fireman | 100 |
| G. Smith, fireman | 100 |
| J. Middleton, chief cook | 100 |
| H. Rankine, boatswain | 100 |
| H. Johanson, able seaman | 100 |
| J. Munning, able seaman | 100 |
| D. Graham, able seaman | 100 |
| G. Smith, able seaman | 100 |
| G. C. Hemberg, able seaman | 100 |
| W. Mitson, able seaman | 100 |
| J. Anderson | 50 |
| J. Hart | 50 |
| A. Duggan | 50 |
| W. Fred | 50 |
| T. H. Stevenson, able seaman | 50 |
| D. McDonald, able seaman | 50 |
| J. Harcus | 50 |
| J. O'Toole | 50 |
| J. Spoors | 50 |
| C. McAvoy | 50 |
| J. Brown | 50 |
| W. Anderson | 50 |
| M. McGrath | 50 |
| R. Green | 50 |

| | |
|---|---|
| A. Wenkin | $ 50 |
| W. Bagsley | 50 |
| S. Hopkins | 50 |
| M. Callan | 50 |
| C. Ralph | 50 |
| D. Buchan | 50 |
| C. A. Dunkley, stewardess | 50 |
| H. Bellmane | 50 |
| J. McGraw | 50 |
| F. Heather | 50 |
| C. J. Shepard | 50 |
| T. Easlea | 50 |
| T. Collins | 50 |
| C. Midlane | 50 |
| D. B. Hastie | 50 |
| A. Henry | 50 |
| G. Clark | 50 |
| S. Cohen | 50 |
| C. Stevenson | 50 |
| G. Bellchamber | 50 |
| J. Nealson | 50 |
| W. H. McPherson | 50 · |
| J. Keir | 50 |
| G. Gawler | 50 |
| A. Quahen | 50 |
| B. Singleton, stewardess | 50 |
| P. Sholders | 50 |
| W. Patrick, barber | 50 |

Let there be a decree in accordance with this opinion.