## THE TOLOMEO.

### (District Court, S. D. Florida. May, 1881.)

1. RIVAL SALVORS.

> When valuable service has been performed, which renders the final saving of property more certain or easy, continued exertion is not necessary to entitle the original salvors to a portion of the salvage awarded.

Libel in Admiralty.

G. Browne Patterson, for libellants.

L. W. Bethel and J. B. Browne, for respondents.

LOCKE, D. J. The bark Tolomeo was discovered aground on a point of the Florida reef, near Tortugas, and boarded by the libellants' crews of four smacks, who found her abandoned and on fire, burning fore and aft, the cabin and much of the deck having been burned and fallen in. Having nothing but a few ordinary buckets, they could do nothing towards putting out the flames, but carried out an anchor to prevent the vessel drifting off, cut away the rigging of the

only standing mast so that it went over the side, and cut two holes in her that she might fill with water. The fire consumed everything above the water line, but about 600 bales of cotton were left in the lower hold. This the libellants commenced to save, but had taken out but about 70 bales when a violent norther drove them from their work and they were compelled to seek a harbor. Upon their return, two days after, they found that, although the anchors had held, the wreck had split in pieces and the cotton gone. One of the smacks, her master thinking it had gone adrift, followed the course of the gulf stream some 200 miles. The other vessels remained in the vicinity, and, as soon as the weather permitted, commenced searching the bottom by dragging and diving, and found that the cotton had been swept off but a short distance and sunk in water of from five to ten fathoms, where it lay scattered on the bottom. Two of the smacks then went to Key West, a distance of about 75 miles, to carry the cotton already saved, but in three or four days returned and again went to work. The other remained at work, and the one which had gone in search of floating cotton returned the fifth or sixth day. One remained, constantly engaged, and the others, after more or less delay, came back. None of them resumed their usual occupation of fishing. In the mean time some 12 other small vessels, whose owners and crews are respondents herein, arrived and went to work, without the original salvors making objection or having any understanding with them. They have saved, by naked diving and dragging the bottom, some 400 bales, which have been libelled and sold, and a salvage of from 50 to 75 per cent. awarded, according to the depth of water and peculiar circumstances attending the saving of each lot.

This libel prays a proportion of the salvage awarded all those not engaged in scuttling the vessel. The defence has been that it has not been shown that the scuttling was of any material benefit, as it may be presumed that the vessel had bilged, and was full of water before that; and, second, that the libellants' leaving the property was an abandonment of the work which sacrificed any interest they may have had

in it. In support of the presumption of bilging, they have shown the dangerous position in which the vessel was placed, the character of the bottom, and severe weather; and of abandonment, the fact that a consortship, which had been originally formed, had been broken after the breaking up of the wreck. The parties have testified to the appearance of the vessel before being scuttled, her buoyancy and being lightly aground and standing upright, and her rapidly settling and careening as she filled. I do not think the presumption of her having been bilged, notwithstanding the bad weather and dangerous bottom, sufficient to overcome the positive testimony of the opinion and belief of parties present, founded, as they appear to be, upon well-established facts. To any one conversant with such matters, it is not a difficult thing to determine, from the comparative buoyancy of a vessel lightly aground, whether or not she is full of water. I am satisfied that in this case the vessel was not so until scuttled, and that she would, in all probability, have burned to a shell, and, being gradually lightened by the burning of her cargo and upper works, drifted off and sunk in deep water.

The scuttling of the ship doubtless saved from fire whatever was subsequently saved from water, and the anchoring, although it did not prevent the breaking up of the wreck, did prevent it going adrift as a whole, and floating into deeper water, where it would undoubtedly have been totally lost. The course pursued by the libellants was the best that could be done, and that it did not prove successful was not their fault. Finding that beneficial service had been rendered, have the libellants lost their rights by abandonment? The principle of law has been well established that where benefits have been rendered to property by one set of salvors, nothing but a voluntary, absolute abandonment of the enterprise and property will lose a right to save or share with others who do save finally; such an abandonment, *cum animo non revertendi,* as betokens an absence of all further interest in the property, and an indifference as to whether it be saved or not. This is the rule where beneficial service has been ren-

dered which has made the final saving more certain or easy; but it will not hold good where but futile attempts have been made, no matter how strenuous or well-intended they may have been. In that class of cases nothing but constant exertion and continued possession will continue such rights. This line marks the difference between the cases cited on each side and relied upon in this case.

In the *Ionge Bastian*, 5 C. Rob. 323, the first salvors having rendered what was considered valuable service, by floating the ship from the rocks, in spite of her subsequent sinking, although they did not stay by her, were permitted to share with those who finally saved her.

In the *Island City*, 1 Black, 121, the schooner Kensington, although neither perfecting the salvage service nor remaining by the vessel,—neither continuing her efforts nor retaining possession,—shared in the award of salvage because she had brought the ship into a place of greater comparative safety. On the other hand, in the *John Wurtz*, Olcott, 462, it did not appear that any beneficial service had been rendered by Jones and his associates, notwithstanding their strenuous efforts, and the remarks of the learned judge, regarding the necessity of possession, can be understood only as applying to such class of cases. *The India*, 1 W. Rob. 406; *The Henry Ewbank*, 1 Sumn. 417.

The presumption of an intention by the libellants to give up the work and abandon the property, arising from the breaking of the consortship, is rebutted successfully by the facts of their future actions. They took an interest in the property, used what diligence they reasonably could in saving some of it, and kept themselves sufficiently near to be thoroughly informed that it was being saved as rapidly as possible. Although they did not apply themselves constantly to the labor of saving it, they never gave up an interest in it nor voluntarily abandoned it. They are, I consider, entitled to a portion of the salvage awarded the others; but, as the labor and hardship encountered by the final salvors was great compared with the salvage awarded, although the percentage given was unusually large, a small proportion will remuner-

ate them better than the respondents will be compensated by the balance, when the actual labor is considered.

In *The Concordia*, decided in this court in 1855, with facts somewhat resembling this, the court gave 8 per cent. of the salvage. I consider 5 per cent. for the libellants as fair a division as can be made between the parties, and the decree will follow accordingly.