## THE LOCH GARVE.

### (Circuit Court of Appeals, Ninth Circuit. October 29, 1910.)

### No. 1,777.

1. SALVAGE (§ 17*)—RIGHT TO COMPENSATION—STRANDED VESSEL.

Salvage compensation will not be awarded in the absence of an engagement for a mere attempt to assist a stranded vessel which produced no result, and was almost immediately followed by the desertion of the distressed ship, without warning or necessity and in good weather.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 30; Dec. Dig. § 17.*]

2. SALVAGE (§ 30*)—AMOUNT OF COMPENSATION—RELIEVING STRANDED VESSEL.

A salvage award aggregating $17,500 made to four vessels for services rendered in floating a steamship valued with her cargo at $150,000, stranded near one of the Hawaiian Islands, which services extended over virtually 24 hours, and, with the effective assistance of a revenue cutter, were successful in releasing the stranded ship without serious injury.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 72–74; Dec. Dig. § 30.*

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

Appeal from the District Court of the United States in and for the Territory of Hawaii.

Suits in admiralty by the Inter-Island Steam Navigation Company, Limited, against the British ship Loch Garve and by the J. D. Spreckels & Bros. Company against the same. The cases were tried together, and decrees rendered for libelants, from which claimant appeals. Modified and affirmed.

Kinney, Ballou, Prosser & Anderson, E. B. McClanahan, and S. H. Derby, for appellant.

A. Lewis, Jr., William O. Smith, Chickering & Gregory, and George H. Whipple, for Inter-Island Steam Nav. Co., etc.

Nathan H. Frank, for J. D. Spreckels & Bros. Co., etc.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. These are admiralty causes, consolidated and tried together in the court below, and were argued and submitted together here. They were brought by the Inter-Island Steam Navigation Company, Limited, and J. D. Spreckels & Bros. Company, respectively, against the British ship Loch Garve, her tackle, cargo, and freight money for alleged salvage services. The ship mentioned, while bound on a voyage from Antofagasti to Honolulu with a cargo of nitrate of soda, stranded on a reef near the harbor of Kamalo, Island of Molokai, about 7 a. m. of Monday, March 4, 1907. The vessels of the Inter-Island Company for which salvage services were demanded by it were the Mauna Loa, Kinau, Iwalani, Likelike, and Claudine, and that of the Spreckels & Bros. Company was its tugboat Intrepid. The result of the trial was an award by the court below to the Inter-Island Company of the aggregate amount of $15,000, with

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

costs amounting to $579.19, and an award in favor of the Spreckels & Bros. Company of $4,000, with costs amounting to $528.26. As a basis for its award, the court fixed the value of the ship at $40,000, the value of the cargo at $110,834.16, freight money $7,460, the aggregate value of the Mauna Loa, Iwalani, Claudine, and Likelike at $430,000, having 189 persons in their crews, in the aggregate, and the value of the Intrepid at $30,000, with 12 persons in its crew.

The case shows that as a matter of fact the Loch Garve was but little damaged by the stranding, and that in the afternoon of March 7th she was floated by the joint assistance of the United States Revenue Cutter Manning, the Inter-Island steamer Likelike, and the tug Intrepid belonging to Spreckels & Bros. Company, after which she was towed into deep water by the Likelike and Intrepid and then to Honolulu by the Likelike. The place of grounding and the situation of the ship upon the reef were thus stated by the trial court in its findings of fact:

"The locality of the grounding of the libelee was near the harbor of Kamalo, which is situated on the south side of the Island of Molokai, in a position which is protected during the prevalence of the northeast trades; that at the time the libelee was aground the weather was variable, the wind being northeasterly at the beginning and on the night of the 6th of March, when four vessels were attempting to float her at high tide, it was blowing with rain squalls from the northwest and west, and at times during such period it was blowing from a southerly direction. The shore at that place during the prevalence of wind from the southwest, south or southeast, would be a lea shore, and fully exposed to wind and sea from those directions. The sea bottom in that locality is soft coral with occasional patches of sand, which is a common condition around the shores of the Hawaiian Islands; and the libelee was imbedded in this material from her stem 128 feet aft to a depth varying from 1 foot and 9 inches abaft amidships to 7 feet 6 inches off her fore hatch and diminishing towards the stem to 4 feet 6 inches, with the bows lifted 2 feet and 7 inches from its position when floating."

The evidence shows that upon the grounding of the ship the sounding of her well disclosed that she was making no water. Her master then directed the starting of the fires in the donkey engine, the clewing of her sails, the dropping of her bow anchor, and the taking of soundings. In the afternoon of the same day, after directing an anchor to be run out from the stern of the ship, he left her with five seamen in a boat for the wharf at Kaunakakai, which he could see ahead, to obtain information and assistance. He arrived there shortly after 5 o'clock in the afternoon, and, learning that a steamer was expected to make that port the next morning, started back to his ship with the boat's crew, but the wind and tide compelled his return to Kaunakakai, at which place he left one of his boat's crew with a message for the expected steamer, and from which place he went the next morning with the remainder of his men by wagon to Kamalo, a place nearer the ship, and from which place he was taken in a canoe by natives back to his ship. Later the captain sent the ship's gig for the man he left at Kamalo, and himself took his wife and child ashore, bringing back to the ship a resident of a neighboring settlement, named Conradt, from whom he learned that the Inter-Island Schooners Mauna Loa and Kinau were due along that coast between 5 and

'6 o'clock the afternoon of Tuesday, March 5th, and who himself rendered valuable services although making no claim for salvage, so far as appears. The captain then ordered signal flags set on the Loch Garve, and had her steel hawsers prepared for use. In respect to the Mauna Loa and the Kinau, the court below found the facts to be as follows:

"On the evening of the next day—March 5th—the steam schooner Mauna Loa, belonging to the libelant Inter-Island, on her regular trip from Honolulu to the Windward Islands, sighted the libelee, came off from her course, anchored near, and made fast to her with considerable difficulty on account of the wind and current, using a wire hawser from the libelee, then steamed ahead and heaved on her anchors. The anchors coming home and the wind and current driving the steamer toward the reef, the hawser was cut, and she went away. on her course, having pulled about an hour by means of her steam winch and about 16 minutes with her propeller, 11 of which were at full speed. From there she went to Lahaina and sent a wireless message to Honolulu reporting the stranding and asking for assistance. The steam schooner Kinau, owned by the Inter-Island, arrived at the locality of the wreck shortly after the Mauna Loa, and anchored and attempted to connect with the libelee, but after a great deal of trouble with her anchors dragging and being in danger of going ashore on the reef with a line under her stern likely to foul her propeller she gave up the attempt, and went on her course."

As to the Kinau, the court below correctly held that she was "a volunteer, accomplished nothing and abandoned her attempt. Compensation," said the court, "is not awarded, in the absence of an engagement, for mere good intentions," and, we add, especially where such intentions were almost instantly followed by desertion of the distressed ship.

In respect to the Mauna Loa, the court below said in its opinion:

"The Inter-Island is entitled to some compensation on account of the services of the Mauna Loa as found above; but her service in pulling on the libelee must be discounted on account of her abandonment of the attempt before any other vessel had made fast to save whatever good results she may have accomplished."

The log of the Mauna Loa shows:

"Mar. 5 arrived at Kamalo reef found British Ship 'Loch Garve' ashore put line aboard and made fast to ship's wire, hauled in till wire was on our stern everything ready to pull at 9:15. Signal to go ahead slow then half speed, full when for some reason the captain ordered line to be cut and we steamed to Lahaina."

The log also shows that at that time both wind and sea were moderate. The master of the Mauna Loa testified, among other things, that his boat pulled slow four or five minutes, and at full speed ten or eleven minutes; the exact time of pulling at half speed not being stated. He also testified that he gave the order to cut the hawser, and, in respect to his leaving, was questioned and answered as follows:

"Q. So, when you left, you left without having notified any one on the Loch Garve that you were going? A. No; I did not notify.

"Q. Didn't give them any signal that you were going? A. No.

"Q. And when you left no other ship there? A. No.

"Q. Your idea was to land your freight and passengers and get word from Lahaina to Honolulu to send assistance? A. Yes."

How much the trial court allowed the Mauna Loa for her services in pulling on the ship there is no means of determining, for in fixing the award to the Inter-Island Company the court based it, in part, upon the aggregate valuation of the Mauna Loa, Iwalani, Likelike, and Claudine, which it found to be $430,000. We are of the opinion that, as the Mauna Loa deserted the distressed ship without necessity, without warning, in good weather, and after but a brief and ineffective effort at help, it is entitled to no compensation other than a reasonable one for sending the telegraphic message from Lahaina to Honolulu, which common humanity should dictate, but for which the admiralty will allow a reasonable compensation as an inducement to others to do likewise.

The Iwalani was the vessel that the captain of the ship had been informed at Kaunakakai, was expected there the next morning, and for which he had left with the man in charge of the ship's boat a request that she should come to the assistance of the ship. Upon the receipt of that request, the Iwalani proceeded to the stranded vessel, arriving there about 3 o'clock in the morning of Wednesday, March 6th, stood by until daylight, and then made fast to one of the ship's hawsers, and pulled more or less steadily until about 2 a. m. of March 7th.

The Likelike, having received at Honolulu the wireless message sent by the Mauna Loa from Lahaina, started out with the superintendent of the Inter-Island Company, Capt. Haglund, on board, and arrived at the ship during the afternoon of the 6th, and, taking a hawser from the Loch Garve, commenced to pull from a position near the Iwalani, and kept up more or less of a strain until the ship was floated.

The Claudine received notice of the ship's plight while she was at the port of Kahului. She, like all of the Inter-Island Company's vessels mentioned, was a steam schooner regularly plying between the various ports of the Islands. Her next regular port of call, after leaving Kahului, was Lahaina, and her next from there was Honolulu. Instead of acting upon the true salvor's impulse of rushing to the relief of the ship in distress, she went to Lahaina, and after finishing her business there, steamed to the Loch Garve, arriving there after dark in the evening of Wednesday, the 6th, when she too took hold of the ship.

The steam tug Intrepid, belonging to Spreckels & Bros. Company, went promptly to the scene of the disaster on hearing of the stranding of the ship, arriving there about 6:30 Wednesday evening, March 6th, and offered her services to the ship's master, but, the compensation to be paid not being agreed upon, the tug stood by until about midnight of Wednesday, when, upon request for assistance, she took position next to the Likelike, made fast to the ship, commenced to pull, and continued to do so more or less until the ship was floated.

The combined pulling of the Iwalani, Likelike, Claudine, and Intrepid was ineffectual even during the high tide of Wednesday night, and about 2 a. m. of Thursday morning the Iwalani and Claudine cut loose and proceeded on their regular runs by order of Capt. Haglund, but with directions to return the next night.

The evidence shows, and the trial court found, that Wednesday night was dark, rainy, and squally, with variable winds; and such was the condition of wind and weather when the Iwalani and Claudine left the ship for their regular business, with orders, however, to return the next night, which they did, but after the ship had been floated. Up to the time of their leaving the combined effort of the Likelike, Iwalani, Claudine, and Intrepid, the court below found, and the evidence shows, had been without "any apparent effect." Leaving the ship under the circumstances stated certainly does not place the Iwalani and Claudine in a high rank as salvors, to say the least, and, as the service rendered by them was without any apparent effect, they are not justly entitled to a high reward. It is true that the court below found the fact to be, and correctly, that the position Wednesday night of all three of the vessels of the Inter-Island Company, namely, the Likelike, Iwalani, and Claudine, as well as of the Intrepid, was dangerous, pulling as close together as they were in the darkness, wind, and rain, and that serious results might have followed any collision, the parting of a hawser, or the dragging of an anchor. Such danger should, of course, be given proper consideration in fixing a just compensation for the salvors. The Likelike and Intrepid responded promptly, and rendered genuine, commendable, and effective salvage services. As has been said, the Likelike left Honolulu upon receiving notice of the stranding of the ship, having on board Capt. Haglund, the superintendent of the Inter-Island Company. Upon reaching the scene of disaster Wednesday evening, she promptly made fast to the ship, and maintained her hold until the latter was floated about 5:30 Thursday evening. The evidence shows that during the time the ship was stranded her captain was under the influence of liquor, which no doubt accounted, in part at least, if not entirely, for the bad discipline of the crew which is shown to have existed, and which ultimately resulted during a part of the time of the Likelike's services in Capt. Haglund, with the consent of the master of the ship, taking practical charge of the operations on board of the ship, as well as of the salvage operations of the Inter-Island Company's vessels. The evidence shows that during Wednesday night a small part of the cargo of the ship—from 15 to 30 tons—was shifted by the ship's crew from its forehold aft, and the next day Capt. Haglund had from 15 to 30 tons transferred from the forehold of the ship to the Likelike by means of the small boats of the latter.

The United States Revenue Cutter Manning, returning to Honolulu from Hilo, and hearing of the stranding of the Loch Garve, went promptly to its assistance, arriving there at 7:15 a. m. of Thursday, the 7th. Her horse power was 2,500, her displacement 962 tons, and she was equipped with one 8-inch hawser, one partially used 10-inch, one new 10-inch, and one new 12-inch hawser. The Manning anchored about a ship's length to the southward and westward of the Intrepid, and on the port quarter of the Loch Garve. The Likelike was then stationed on the other side of the Intrepid, and about a ship's length therefrom. Upon anchoring, the commanding officer of the Manning had a boat lowered and personally took soundings to

the northward and eastward between the bow of the Likelike and the bell buoy off Kamalo, and also towards the stern of the stranded ship. After taking the soundings, he moved the Manning closer to the Loch Garve, anchoring on her port quarter abeam, and then ran a 10-inch hawser to the ship. About that time, to wit, 9 a. m., Capt. Haglund went on board the Manning, where, after discussing the conditions with the commander of the cutter, it was agreed between them that a pull should be made on the ship that night at 10 o'clock, when there would be high tide again. The evidence is that the weather was good during Thursday and the sea smooth. At 12:50 p. m. of that day the Manning commenced pulling on her 10-inch hawser, using, however, only a part of her horse power, and, with the exception of a few minutes about 1:30 p. m., maintained its strain until its line parted at 5:10 p. m. The testimony of Capt. Joynes of the Manning is to the effect that, while during the morning of that day the Likelike and Intrepid were pulling upon the ship, in the afternoon the hawser of neither of those boats seemed to have much, if any, strain upon it; and, while the testimony upon the part of the libelants is to the contrary, we think the circumstances of the case corroborate the statement of the commander of the Manning. Certainly the pull made by the combined efforts of the Likelike and Intrepid during the morning of Thursday was ineffectual; nor could it have been expected to have been otherwise since the combined pull of those two vessels, supplemented by that of the Iwalani and Claudine, during the high tide of Wednesday night, was without any apparent effect. At the time the Manning's line parted, Capt. Haglund was on board of the Intrepid, and had been there for a considerable period. A few minutes after the parting of that line, he left the Intrepid for the Likelike, and, being hailed by Capt. Joynes, went on board the Manning, where he was when the ship was floated—somewhere between 5:17 and 5:27 of Thursday afternoon.

While the strain put upon the Manning's hawser was by no means her maximum pull, nor, according to her commander's testimony, the maximum strain he expected to eventually put upon it, still the strain exercised was sufficient to part her 10-inch line, which was followed within a few minutes, as has been seen, by the floating of the ship. We think it impossible to conclude from all the facts and circumstances of the case, the principal ones of which have been above referred to, that such floating was caused mainly by the pulling of the Likelike and Intrepid, although whatever strain they had upon their lines no doubt contributed to that end. We are of the opinion that the principal cause of the floating of the ship was that stated by Capt. Joynes in his testimony where, in answer to the question, "Q. What is your opinion, Captain, as to how and why the Loch Garve came off?" he answered:

"A. Well, I think it would practically be from the constant straining on the Manning's hawser from 12:40 until 5:10 p. m., the quartering pull. The vessel was not run upon the reef, because her water line showed practically the same when she came afloat as when she was, as we say, on the reef. The vessel was probably wedged in the reef between coral boulders, driven up by strong northeast trade winds, wedged between boulders, not being on

the reef. It was due partially to our quartering pull and to the vessel's being wedged only for a short distance from her stem. We had a long leverage on her counter, and worked her slightly which was indicated by the water rising under her starboard bow. It was also due to the efforts of Capt. Haglund in lightening the cargo out of the forward hold.

"Q. It was due to Capt. Haglund's lightening the cargo out of the forward hold? A. Yes; and taking it aboard the Likelike.

"Q. How long did that lightening process continue? A. Roughly speaking, from about 1 o'clock until the vessel came afloat.

"Q. What was the effect of this quartering pull from 12:40 to 5:10; what was the effect on the Loch Garve, aside from the parting of your hawser? A. Well, I can only answer from inference that the moment our hawser parted her stern heaved to starboard.

"Q. What do you think was the effect of your quartering pull on the question of the size of the bed which held the Loch Garve forward? A. I think it was good because we worked her on this long leverage.

"Q. That would have a tendency to do what? A. To loosen her. She was like a wedge driven in a log, cleft in the reef.

"Q. And what effect did that have on the reef itself where she was driven? A. It would be to gradually, very slowly, crush the coral under her starboard bow, and in that way to loosen her."

While we are of the opinion that the Manning was mainly instrumental in floating the ship, we think the Likelike and Intrepid, as has already been said, rendered genuine, commendable, and valuable salvage services, and should be liberally rewarded. It is obvious, however, that the court below, in including the valuation of the Mauna Loa as a basis for the fixing of its award to the Inter-Island Company, proceeded upon a wrong principle. We are of the opinion that in view of all of the facts and circumstances of the case $12,500 is a very liberal sum to be allowed that company for the services of the Likelike, Iwalani, Claudine, and Mauna Loa.

The cause is remanded, with directions to modify the decree as indicated, and, as so modified, it will stand affirmed.