### UNITED STATES v. ASLAKSEN.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1922.)

No. 3633.

1. **Salvage ⬅29—Award to master sustained.**

An award of $3,000, to the master of a government steamship for services rendered in the salvage of another government vessel, affirmed, where the salved vessel was a laden tank steamer, worth, with cargo over $1,900,000, lying wholly disabled in heavy seas 500 miles from St. Johns, Newfoundland, without other hope of assistance, the salving vessel, worth $900,000, was not equipped for towing, and the service was attempted against the judgment of some of its officers and after six days of continuous fog, during which both vessels were in considerable danger, was successfully accomplished by delivering the tank steamer safely at St. Johns.

2. **Salvage ⬅25, 51—Amount of award within judicial discretion of trial court.**

In the absence of adoption of erroneous principles or plain misapprehension of facts, the precise amount of a salvage award is committed to the judicial discretion of the trial court, and though an appeal brings up the case de novo, the appellate court should not disturb the exercise of this discretion, which plainly has not been abused.

Appeal from the District Court of the United States for the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit in admiralty by Olav Aslaksen against the United States. Decree for libelant, and the United States appeals. Affirmed.

For opinion below, see 273 Fed. 241.

This is an appeal by the United States from an award in a salvage case. Both the salving vessel (the Lake Ellenorah, of which appellee was master)

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and the salved vessel (the Avondale) were government owned. No question is raised respecting liability to salvage award. Indeed, express provision for libel in personam is made by statute where the United States owns the salved vessel. 41 Stat. p. 525, c. 95. The appeal concerns only the amount of the award. The following history of the salvage service rendered appears by the agreed statement of facts:

On the morning of November 5, 1919, while in the North Atlantic Ocean, 500 miles or more southeasterly from St. Johns, New Foundland, the Lake Ellenorah, then on her voyage, in ballast, from Plymouth, England, to Norfolk, Va., picked up a wireless call for assistance from the steamship Avondale, to the effect that she was in distress, asking for assistance, and indicating her location. The Lake Ellenorah's course was altered, and she steered for the location indicated, which proved to be about 100 miles distant. The wind had been blowing very hard from the southeast for several days, with violent seas, and although the wind had now fallen there was running a very heavy sea or swell, which in fact continued for several days thereafter and until the change of weather hereinafter mentioned. The weather was foggy and this condition continued off and on during the ensuing six days, covering the whole time of the salvage service. Between 7 and 8 o'clock that evening the Lake Ellenorah came up toward the Avondale, which showed a bright light as a guide, and found that vessel entirely disabled, floundering and laboring in the seaway, without ability to navigate and unmanageable, drifting at the mercy of the elements, and was informed that she had been so lying sending out wireless calls for assistance for a number of days; that the machinery was so disabled that the main engine could not be used at all, her engine room described as a wreck, and conditions such that it was impossible for necessary repair and reconditioning to be made at sea, and, as after developed, incapable of steering well when taken in tow. Such conditions her master reported to appellee, and that her crew was worn out, and he asked that the Lake Ellenorah attempt to tow the Avondale to some place of safety, if possible, and as soon as possible. The Avondale, valued at about $1,800.000, was a large oil tank steamer, some 400 feet in length, 54 feet beam, 3,511 tons custom house measurement, and carrying capacity of about 9,000 tons, laden with a cargo of 8,250 tons of oil, of a value of about $132,000, and drawing about 28 feet of water, bound on a voyage from the United States to Greenock, Scotland. The Lake Ellenorah, rated by the Shipping Board as $900,000 or more in value, was 253 feet long, 43 feet beam, 1,662 tons custom house measurement, and carrying capacity 3,000 tons, and was in ballast only, and drawing about 12 feet forward and 16 feet aft. She was not constructed as a towing ship, nor adapted to that service, having no appliance or towing bitts, and no place for making fast a line aft, except at the regular quarter bitts on either side. When the Lake Ellenorah so reached the Avondale, the ships were in the open Atlantic, some 500 miles off the coast, and about that distance from St. Johns, the nearest safe port, at a season of the year and in a latitude where a low barometer might be expected at any time, with heavy gales and bad weather, and in all ways it was an extremely dangerous place for an unmanageable ship, such as the Avondale was, with continuous danger, even after she should be taken in tow, of the towline parting, and with substantial danger of accident to either ship, which might set her adrift with probability of meeting even the gravest disaster.

Appellee, after consultation with his officers, and not without some disapproval and opposition to undertaking the task with such a ship as the Ellenorah, considering also the great bulk and weight of the Avondale, the weather conditions, and the season, nevertheless determined to attempt the salvage undertaking, and notified the master of the Avondale that he would do so, and set about the business of getting a line between the ships. The Avondale had no available line, but the Lake Ellenorah herself had a wire cable of 120 fathoms carried for use in emergency, and appellee decided to use that; the Avondale to attach a working line to a lighted buoy and let that drift down to the Lake Ellenorah. When she got in position to leeward for that purpose, it was found that the Avondale was drifting faster than the buoy, and the Lake Ellenorah had to work around to the other side, where the

cable was so passed and made fast on the Avondale, and attached to the Lake Ellenorah by rope bridles made fast on the quarter bitts. After some hours, so employed the Lake Ellenorah started up, at first slowly, and was able to make 4 miles an hour; but the Avondale was unable to steer after her, sheering broadly, and with the plunging of the ship such strains were brought as to part first one of the bridles and a little later the towing cable parted. Communications then passed between the ships—the Lake Ellenorah agreeing to stand by until morning and make another attempt; the master of the Avondale reporting that he had found below and they would be able to get up a 10-inch hawser and wire cable, each 120 fathoms, during the night. Libelant advised that they get these up and in the morning make them fast together, stick out 15 fathoms of her anchor chain, and attach the towing cable to that, to avoid chafing at the end, all with the purpose that with the extreme length of the combined cable and hawser and the weight, including the 15 fathoms of chain, they would be able to make progress and continue the efforts, unless they should encounter too bad weather, and provided the Avondale could be made to steer well enough to follow. The Lake Ellenorah had a working boat, called a "dinghy," suitable for use in seaway by two men, and appellee's son, who was one of the crew, and the third officer volunteering to go in the boat, the Lake Ellenorah worked into position to make a lee for her, and by using first a smaller working line got the end of the towline and made it fast with special chafing gear, and so succeeded in having the Avondale again in tow. In her disabled condition she steered badly in the seaway, from which much difficulty was encountered; the master of the Avondale reporting by wireless from time to time that they were doing and would do their best to follow. Difficulty also was encountered from the racing of the propeller wheel, as the Lake Ellenorah's stern would lift with the swells. Such conditions, and generally the character of the service, required from the beginning constant attention and watchfulness by appellee; the foggy character of the weather and consequent unsatisfactory observations as to position being added to the other elements of uncertainty.

Thus proceeding, making an approximate northwest course for St. Johns, on the evening of November 8th, the wind suddenly veered around to the northwest, blowing hard and increasing. Opposed to the heavy southeast swell running, this caused a nasty, irregular sea, adding to the difficulties and the care resting on appellee, and causing much anxiety aboard both ships, which were then in the vicinity of the dangerous Virgin Rocks, which were to be passed to the northward. The wind and sea and currents created were causing them to drift seriously, and on the afternoon of the 9th became so that the expedition was unable to make headway, but was drifting and in danger of going on Virgin Rocks, in spite of every effort. It was afterward reported by some on the Avondale that the breakers could be heard. The weather was foggy, observations had not been dependable, and exact positions could not be fixed; but appellee determined to hold on to the Avondale and change his course and run off more southerly, with the wind abaft the beam, and try to get enough headway to clear Virgin Rocks to the westward, and he was able to communicate with Cape Race for such confirmation as was possible concerning his position. First giving direction to the Avondale, the Lake Ellenorah was put on such course with the wind abaft the beam until as nearly as appellee could calculate they had successfully cleared, when he adopted a course for Cape Race, and about 10 hours later sighted that light. The course was then adopted for St. Johns, where they arrived about 3 p. m. November 11th. Neither vessel sustained any material damage in the salvage operation, which was performed successfully. During the whole period from November 5th until the afternoon of November 11th appellee had the sole responsibility of directing the operation, with the accompanying anxiety, and was on deck and in active charge almost continuously, not being able to retire during that time and securing only short, intermittent naps in the rest room, that the condition prevailing as above noted made the situation and services throughout hazardous, requiring judgment, courage, and skill, and the enterprise was so conducted by appellee as to result in bringing the Avondale, her crew, and cargo to port in a safe harbor.

Thereafter the Shipping Board Emergency Fleet Corporation recognizing that the appellee and crew of the Lake Ellenorah performed with judgment, courage, and skill the task of bringing the Avondale to the nearest available port, and as compensation for the services rendered, under the authority of a resolution of that board, made and tendered the appellee and crew of the Lake Ellenorah an award in the amount of $7,000, which the board apportioned among the officers and crew on the basis of their respective monthly pay, except that the master (appellee) and the chief engineer were each awarded a double share; that is to say: While the award to the other officers and the crew was slightly more than 150 per cent. of the monthly pay of those respective officers and members of the crew, the awards to appellee and the chief engineer were slightly more than 300 per cent. of the monthly pay of those respective officers, the master's share thus being $1,008.78. With the exception of appellee, all the officers and members of the crew accepted and received their proportionate amounts of the award. Appellee refused to accept the amount awarded him, and accordingly filed this libel.

It was stipulated below that the award to be made by the court should not be less than that granted by the Shipping Board. The District Judge was of opinion that the amount awarded by the Shipping Board was too small, and that $3,000 would be a conservative award, and made decree accordingly. 273 Fed. 241.

J. Frank Staley, Sp. Asst. Atty. Gen. (E. S. Wertz, U. S. Atty., and D. J. Needham, Asst. U. S. Atty., both of Cleveland, Ohio, on the brief), for the United States.

William M. Connelly, of Cleveland, Ohio (Goulder, White & Garry, of Cleveland, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). [1] It was rightly considered by the District Judge, and is conceded by the government, that the elements to be taken into account in determining the amount of a salvage award include the labor expended by the salvors, the promptitude, skill, and energy displayed by them in rendering the service, the value of the property employed therein, the danger to which the same is exposed, the risk incurred by the salvors, the value of the property saved, and the degree of danger from which the property was rescued. In reaching his conclusion the District Judge expressed the opinion that on the basis adopted in numerous cases, many of which were cited, a salvage award of $100,000 for the total services rendered by the Lake Ellenorah, including those of her master and crew, would not be excessive; that an allowance to the master and crew of one-third this amount would be sustainable, and that an award of one-quarter this latter amount to the master would not be out of accord with American practice.

The government criticizes the basis of $100,000 as a theoretical total award; its counsel expressing the view that to allow it to go unchallenged would seriously prejudice the rights of owners of vessel property. Manifestly, each case must depend upon its own peculiar circumstances, as is illustrated by the cases cited by court and counsel. In some of them the towage was for a much greater distance than here; in others less. In some the dangers and difficulties were greater; in others, less. Manifestly, awards in fire and stranding cases do not furnish a satisfactory criterion. In the instant case the Avondale was not a derelict. Its power of propulsion and largely of steerage was gone. There was

fog and some sea, but the storm had ceased when the Lake Ellenorah arrived. Human life was apparently not immediately in danger. Under the modern wireless system the dangers of loss from attempted salvage are less than ever before in the history of navigation. In this case the Shipping Board was kept in constant communication with the salving vessel from the time the Lake Ellenorah reached the Avondale. This is not to discredit in the slightest degree the judgment, courage, and skill shown by appellee in bringing the Avondale into the harbor of St. Johns. While the service rendered was, at the last, largely in the nature of towage, it was performed under the weather conditions already stated, with the element of danger and risk necessarily present, as well as the inherent unsuitableness of the Lake Ellenorah for towage service. But, on a careful review of the more prominent precedents, taking into account all the circumstances, including the value of the property salved and that employed, the fact that so far as based on percentage of value the percentage should decrease as the value increases, and that the percentage basis does not seem in recent years to be followed as strictly as formerly, we think the government could justly complain of an award to appellee based upon a theoretical allowance of $100,000. The trial judge, however, did not make his award to appellee upon that basis. On the contrary, he adopted the award of $3,000 to the master as "modest, not liberal, compensation." Manifestly, had the award to the master been upon a theoretical total award of only $50,000, a division on the basis of one-quarter of that amount to the master and crew, and one-quarter of that one-fourth to the master (as some of the authorities recognize as proper), would give him more than the $3,000 awarded by the District Court.

[2] In the absence of adoption of erroneous principles or plain misapprehension of facts, the precise amount of the award is committed to the judicial discretion of the trial court; and although this appeal brings up the case de novo, we think we should not disturb the exercise of this discretion, which plainly has not been abused. Oelwerke-Teutonia v. Erlanger, 248 U. S. 521, 39 Sup. Ct. 180, 63 L. Ed. 399; The Kanawha (C. C. A. 2) 254 Fed. 762, 764, 166 C. C. A. 208. While awards of this character are partly by way of compensation and partly as a reward for meritorious services, we think the latter consideration the more prominent; and we think the master, in view of his ultimate responsibility for both his own boat and the tow, as well as the latter's cargo, was entitled to a materially larger award than that given the first engineer (which was $932). It is also to be noted that appellee's responsibility, and thus the credit due his accomplishment, was increased by the fact that the salvage was undertaken with the opposition of some of the Lake Ellenorah's officers. The fact that both the salving and the salved vessels were owned by the United States does not necessarily affect the amount of compensation. Jacobson v. Panama R. Co. (C. C. A. 2) 266 Fed. 344.

In our opinion the master is entitled to a substantially greater award than given by the Shipping Board. Just how much greater is mere matter of judgment, and we are content to accept that of the trial court.

The order of the District Court is accordingly affirmed.