**SAINT PAUL MARINE TRANSPORTA-TION CORP., et al., Plaintiffs-Appellees,**

**v.**

**CERRO SALES CORPORATION, Defendant-Appellant.**

**No. 72–1675.**

United States Court of Appeals, Ninth Circuit.

Sept. 13, 1974.

---

17. Macaulay's History of England, Vol. 1, p. 440.

George L. Waddell (argued), of Dorr, Cooper & Hays, San Francisco, for defendant-appellant.

Paul F. Cronin (argued), of Cronin, Fried, Sekiya & Haley, Honolulu, Hawaii, for plaintiffs-appellees.

Before HUFSTEDLER and WRIGHT, Circuit Judges, and WILLIAMS,* District Judge.

* Honorable Spencer Williams, United States District Judge, Northern District of California, sitting by designation.

## OPINION

SPENCER WILLIAMS, District Judge:

Early in the morning of June 23, 1968 the crew of the SS North America, a small Liberian tramp freighter, abandoned its flaming vessel approximately 600 miles east-southeast of Honolulu. The ship's $1,850,000 cargo of copper concentrates bound for South America belonged to appellant Cerro Sales. The U. S. Coast Guard picked up the crew's distress signal and at approximately 1515 (HST) directed the M/V St. Paul, a huge Liberian bulk carrier to proceed some 30 miles to render assistance to the disabled vessel. The St. Paul swept the area for some time, rescued 22 survivors and then turned its attention to saving the ship.

Crewmen from St. Paul under the leadership of Second Mate Anastasio boarded the North America that afternoon and again the next day. While the testimony is conflicting as to what happened on the respective days, it is clear that they extinguished several small fires, cleared the decks of burning material, closed several open doors, and on the second trip rigged an emergency towing wire from the North America's bow to the St. Paul's stern. The towing attempt was discontinued when the line snapped. On June 24th the St. Paul obtained Coast Guard permission to leave and proceed to Honolulu where the North America's crew was put ashore.

The Hawaiian tug Malie, engaged by owners of the North America, left Honolulu June 28th, reached the distressed ship five days later, took it in tow and returned with it to Honolulu. The North America was sold as scrap but the $1.85 million cargo was saved intact.

The District court, in an opinion reported at 332 F.Supp. 233 (D.Haw. 1971), granted plaintiff a salvage award of $200,000, 65% to go to the vessel St. Paul and her owners with the remaining 35% to go to the officers and the crew. An extra $1000 was granted to Second Mate Anastasio and $500 to each other member of the boarding party.

Cerro Sales appeals the decision on six grounds: (1) all the actions of the vessel St. Paul were taken for the purpose of rescuing the crew of the North America—not for saving property—and therefore, the St. Paul and the non-boarding crew members are not entitled to a property award; (2) the master and crew are not parties to this purported class action; (3) plaintiffs did not sustain the burden of proving their activities saved the North America and her cargo; (4) the St. Paul, having voluntarily abandoned the North America, is precluded from a salvage award; (5) the district court erred in refusing to reopen the case to take testimony from a witness after a decision was entered; and (6) the amount of the award was unreasonable in relation to the services performed.

### The Award to the Owner and Non-Boarding Crew Members

Appellant contends only crew members who went aboard the North America performed salvage acts with respect to the North America's cargo and this precludes the St. Paul's owner and the non-boarding crew members from sharing in the salvage award. This position is contrary to established admiralty law. All who render service in a salvage operation may share in an award. Each individual need not actively participate by manning the small boats, boarding the salved vessel or fighting fires. Norris, The Law of Salvage § 48. Every man's duties on the salving ship contribute to the property salvage and the law extends a portion of the award to even a "scullion in the galley peeling potatoes while the actual salvage work is going on." The Centurion, 1 Ware 490 (D.Me.1839). See also The Norden, 1 Spinks 185 (1853); The Barge Ulak, 1924 A.M.C. 1500 (S.D.N.Y.1924).

Similarly, the owner of the salving vessel need not personally participate in the salvage service to receive an

award. Norris, *supra*, § 57; The Blackwall, 77 U.S. 1, 10 Wall. 1, 19 L.Ed. 870 (1869); The Camanche, 75 U.S. 448, 8 Wall. 448, 19 L.Ed. 397 (1869); Sear v. SS American Producer, 1972 A.M.C. 1647 (N.D.Cal.1972); Conolly v. SS Karina II, 302 F.Supp. 675 (E.D.N.Y. 1969).[1]

### Class Action Requirements

This action was properly maintained by the St. Paul on its own behalf and on the behalf of the master and crew and is not subject to Federal Rule of Civil Procedure 23.

■■ Admiralty courts have long accepted the obvious judicial economy in maritime representative suits to allow owners of salving vessels to sue on behalf of the master and crew although judgments in such suits do not provide complete theoretical protection to the defendants. The Camanche, *supra*, at 470–77, 2 Benedict, Law of American Admiralty § 247. See 1 Benedict, *supra*, § 123, The Lowther Castle, 195 F. 604 (D.N.J.1912); The Neptune, 277 F. 230 (2d Cir. 1921).[2]

### Defense and Abandonment

■ Appellant had the burden of proving the affirmative defense of abandonment. If a potential salvor does abandon a distressed vessel, it is precluded from any award. The abandonment, however, must be voluntary, absolute and of such nature that indicates an absence of all further interest in the property or an indifference to whether it will be saved or not. The Loch Garve, 182 F. 519 (9th Cir. 1910); The City of Puebla, 153 F. 925 (N.D.Cal.1907); The Strathnevis, 76 F. 855 (D.Wash.1896); The Angeline Anderson, 34 F. 925 (D. N.Y.1888); The Khio, 46 F. 207 (D. Md.1891); The Aberdeen, 27 F. 479 (E.D.N.Y.1885); The Tolomeo, 7 F. 497 (S.D.Fla.1881). Therefore, if a salving vessel, after doing all it can and having contributed to the salvage of the vessel, finds it impossible to continue and complete the entire salvage, the doctrine of abandonment does not apply. The Fisher's Hill, 1953 A.M.C. 2037 (S.D.N.Y. 1953), rev'd. sub nom. Lago Oil and Transport Co. v. United States, 218 F.2d 631 (2d Cir. 1955); Atlantic Transport Co. v. United States, 42 F.2d 583 (Ct. Cl.1930); The Strathnevis, *supra*. The District Court found that the St. Paul had not abandoned the North America, and in view of the evidence of the attempted (though unsuccessful) tow, the boarding of the vessel, the extinguishment of deck fires, clearing of burning material, closing of open doors, notification to the Coast Guard of the North America's position and the St. Paul's remaining on station until authorized to depart, it cannot be said that such a finding is clearly erroneous.[3]

### Refusal to Reopen Testimony

■ The refusal to reopen the testimony to call a new defense witness was

---

1. Appellant also points out that proceeding to the disabled ship, rescuing survivors, searching for lost crew members and transporting the survivors to Honolulu were actions directed at "life salvage." If this was all that had been done by the St. Paul, plaintiffs would be limited to an action against the tug Malie for a share of its propery award under 46 U.S.C. § 729. The fire fighting and closing of doors were directed at saving the cargo and have given the owner and the non-boarding crew members a right to participate in any salvage award. See St. Paul v. Cerro Sales, 313 F.Supp. 377 (D.Hawaii 1970).

2. The Advisory Committee on the Federal Rules of Civil Procedure, commenting on the merger of admiralty and civil practice, treated representative marine salvage suits under Rule 17(a) and not under Rule 23. See 7A Moore's Federal Practice ¶ .55(3).

3. The defendant suggests the plaintiff should have attempted more than one tow, searched below deck for water leaks and additional fires, rigged navigational running lights and left a crew to stand watch until a salvage tug arrived. A suggested course of conduct made with the benefit of "20-20" hindsight does not alter an appellate court's standard of review over district court factual determinations.

not an abuse of discretion under Rule 59(a) of the Federal Rules of Civil Procedure. The motion was made two months after the Decision was entered and over four months after the trial. The trial court obviously did not consider any new evidence either necessary or proper.

## Factual Support for the District Court's Findings

Defendant vigorously asserts the record does not support the district court's determination that the firefighting and the closing of certain apertures significantly contributed to the salvage of the vessel and her cargo.[4] The record contains over 850 pages of reporter's transcripts, two depositions of witnesses upon written interrogatories and four depositions on oral interrogatories along with innumerable photographs, log books and transcriptions of radio messages. Additionally, the circumstances surrounding the presentation of evidence were somewhat unusual given the international composition of the crew, numerous language difficulties, and the time-lag between the accident, when the statements were taken and the trial.

The trier of fact has the duty to sift through the inconsistencies of testimony, to weigh the credibility of witnesses and to resolve any ambiguities in the evidence. The scope of appellate review is a narrow one limited to setting aside findings of fact only when they are clearly erroneous. Federal Rule of Civil Procedure 52(a); Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L. Ed.2d 205 (1962).

The trial court found that (1) a crew from the St. Paul boarded the North America June 23rd, (2) a second party went aboard on June 24th, (3) crew members closed open doors and portholes,[5] (4) the North America's stern was down and her freeboard was less than normal, (5) the crew extinguished numerous fires on the deck, hatch covers and threw burning debris into the sea, and (6) but for these activities the North America would have sunk.

The district court relied quite heavily on the testimony of John Walsh, plaintiff's expert witness,[6] in making its award. Answering a hypothetical question, Walsh testified that, in his opinion, two series of acts performed by the St. Paul's crew saved the ship.[7] He con-

---

4. The district court correctly discounted all activities directed at life salvage from its consideration of the property salvage award and also noted that the "bare attempt" to tow the North America had not contributed to the ultimate salvage of the cargo.

5. Defendant belatedly objects that certain statements made by Seaman DiColo were inadmissible hearsay and therefore, improperly considered by the district court. Counsel must make and preserve his record at the trial level and may not present new objections on appeal. The record clearly shows that defendant waived any objection to the admissibility of the statement on two occasions. Reporter's Transcript at Pages 12 and 147.

6. Probably the most significant evidence presented came from Mr. John Walsh, an expert witness presented by plaintiff, and one of three surveyors who surveyed the North America upon her arrival at Honolulu. Mr. Walsh has impressive credentials and presented himself and his testimony in a manner most persuasive upon the Court."

See 332 F.Supp. 233, at 237–238 (D.Hawaii 1971).

7. Plaintiff asked Walsh to assume the following facts before giving his expert opinion:
   (1) a boarding party had gone aboard the North America,
   (2) members of that party had extinguished the following small fires:
   (a) debris fires in the area between No. 4 and No. 5 hatches,
   (b) small fires in the after area of No. 4 hatch,
   (c) other fires in the area of No. 3 hatch,
   (3) threw burning boards and other items overboard from the areas around both No. 3 and No. 4 hatches,
   (4) neither No. 5 hatch cover was damaged by fire nor the after accommodation house was damaged by fire.
   (5) the aft portholes were partially submerged before the vessel reached Honolulu, and

cluded that without the firefighting action by the crew, the fire would have spread to the No. 5 hatch and the after accommodation house. The hold under No. 5 hatch would then have been open to sea water.[8] If the after accommodation house had burned, the portholes below decks would have disintegrated and have been open to the sea. As noted, these portholes were partially submerged when the North America reached Honolulu. Therefore, but for the firefighting actions, sea water would have flowed into both the aft-hold of the ship and into the after accommodation house through the open portholes. Walsh emphasized that had either one or both of these events occurred, the North America would have sunk.[9]

Walsh also testified that, independent of the fire-fighting, the closing of open doors and portholes contributed to the ultimate salvage of the cargo. The stern was down when the salvage tug Malie reached the North America, her freeboard was less than normal and the surveyors ultimately found approximately 15 feet of water in the engine spaces. Walsh persuaded the court that any sea water that had been kept out of the ship could well have been the overbalancing amount that would have sunk her. When the salvors closed the doors and portholes, they prevented the awash deck conditions and the lack of freeboard from reaching a critical point, thus keeping the North America afloat until the salvage tug reached her.

█ This expert opinion, obviously persuasive to the district court, is properly supported by facts in the record. The determination that the St. Paul's crew saved the defendant's cargo is therefore not clearly erroneous.

*The Size of the Award*

Of the $200,000 awarded, $130,000 (65%) went to the St. Paul and her owners, [including $15,000 for reimbursement of costs and expenses], and $70,000 went to the officers and crew. Appellant argues this award is "grotesquely excessive" in relation to the labor expended and the risks incurred.

█ The Supreme Court has suggested the following criteria for determining an appropriate salvage award: (1) the labor expended by the salvors in rendering the salvage services, (2) the promptitude, skill and energy displayed in rendering the service and saving the property, (3) the risk incurred by the salvors in securing the property from its peril, (4) the value of the property saved, (5) the degree of danger from which the property was rescued, and (6) the value of the property employed by the salvors and the danger to which the property was exposed. The Blackwall, 77 U.S. 1, 13–14, 10 Wall. 1, 19 L.Ed. 870 (1869).

These guidelines have weathered the storms of the past century. See *Norris, supra*, at 386 (1958); Seaman v. Tank Barge OC601, 325 F.Supp. 1206, 1208–1209 (S.D.Ala.1971). An inspection of the district court's opinion in this case indicates that in making the award he applied factors analogous to these guidelines.

█ The St. Paul, her master and crew performed in careful, seamanlike fashion while boarding the burning ship, fighting the fires, sealing off the lower spaces and attempting to tow the North America; they willingly exposed themselves to considerable danger by boarding a burning, disabled vessel un-

---

(6) the North America had a freeboard of less than normal when she was towed to safety in Honolulu.

The testimony of the various witnesses, although varying to some degree, placed all the above facts before the court.

8. Walsh testified that this would have caused the aft end to submerge and/or increase the

"probability of a decisive free-surface area in No. 4 hold," (i. e. cause the North America to roll heavily in a very sluggish manner allowing the sea to break over the open deck).

9. Reporter's Transcript Page 360.

der the threat of continuing explosions. The danger of collision between the two ships during the abortive towing operation was extremely high due to the North America's short tow line. The salvaged property had a stipulated value of $1.85 million and was in imminent danger of being lost when the North America was saved. The St. Paul, carrying a cargo valued at $750,000, was worth over $4 million.[10]

Appellant further contends that any dangers to which the St. Paul and her cargo were exposed during the unsuccessful towing attempt must be disregarded when determining the size of the award.[11] Admiralty courts award property salvage as a matter of public policy to induce future potential salvors to assume the inconvenience and unknown risk inherent in every salvage effort.[12]

The question thus becomes whether, as a matter of public policy, the courts should consider only the risks inherent in a ship's good faith attempts at rescue that are actually shown to have contributed to the rescue.[13]

The evidence indicates the St. Paul's master, although apprehensive of the risks involved, told his owners he would attempt to tow the North America to safety.[14] He sent members of his crew aboard the North America to extinguish the fires and to rig the ship for towing. These activities were interrelated portions of the salvage operation which, *in toto*, saved the cargo. Portions of that successful salvage may not be discounted when figuring the size of the award. To do so would discourage future salvors from attempting similar acts when given the opportunity to render assistance and frustrate the policy underlying marine salvage awards.

It would be unwise to accept appellant's totally unsupported premise that unsuccessful efforts contained within the context of an overall successful salvage operation may not be considered. A successful salvage must be viewed as one continuum from beginning to end. Any other rule would require courts to make speculative and unreasonable dissections of complex, multi-faceted salvage operations. By way of example, if defendant's rule were applied to the plaintiff's activities in this action, the trial court would be required to determine the quantum of risk and the contribution to the ultimate salvage of each extinguished fire, each closed porthole and question whether each man who boarded the disabled ship successfully extinguished a fire or closed a crucial door. This type of determination has not been required to date and nothing warrants the implementation of such a restrictive rule.

However, the $15,000 reimbursement for costs, included in the owner's

---

10. Statistical comparisons, while not dispositive, can be helpful. The owners of the St. Paul received a $130,000 award or less than 3% of the combined value of the St. Paul and its cargo that had been exposed to risk of loss during the salvage operation.

The $200,000 salvage award is approximately 11% of the value of appellant's cargo that would have been lost but for the St. Paul and her crew.

11. Merrit & Chapman v. United States, 274 U.S. 611, 47 S.Ct. 663, 71 L.Ed. 1232 (1926), cited by defendant, does not support its position. In that case, a vessel, lying next to a blazing pier, was cooled by an overflow of water that had been directed at the pier fire. The Supreme Court refused to allow a salvage award on the grounds that any aid to the ship was both unrequested and merely incidental.

12. Waterman SS Corporation v. Dean, 171 F.2d 408 (4th Cir. 1948), cert. denied 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732 (1948); The Kia Ora, 252 F. 507 (4th Cir. 1918); United States v. Aslaksen, 281 F. 444 (6th Cir. 1922); The Varzin, 180 F. 892, aff'd 185 F. 1007 (2d Cir. 1910); The Philah, F.Cas.No. 11091a (D.Fla.1857). See also, Dize v. Steel Barge Beverley, 247 F. Supp. 968, 973 (E.D.Va.1965).

13. Success is a prerequisite to any salvage award. Courts will not reward any efforts, however meritorious, if the property is not ultimately saved. However, the St. Paul and her crew *were* successful in saving both the ship and her copper cargo.

14. See Exhibits P–5(a), P–16, P–37, P–41, and P–42.

$135,000 award, was erroneously computed on an alleged three-day effort during the salvage operation. The St. Paul was only engaged for 25.5 hours and the $3,840.00 daily cost estimate was unrefuted. The award for costs will therefore be reduced to $4,070.40.

The judgment of the district court is affirmed with the reduction of the owner's share to $124,070.40.

EUGENE A. WRIGHT, Circuit Judge (concurring):

I concur in Judge Williams' opinion with the following additional comments concerning the issue of abandonment.

As Judge Williams points out, if the distressed ship is ultimately saved, the general rule that an abandoning salvor forfeits a salvage award does not preclude an award simply because the salvor does not complete the task of saving the distressed ship. *See* The Fisher's Hill, 1953 A.M.C. 2037 (S.D.N.Y.), rev'd sub nom. on other grounds Lago Oil and Transport Co. v. United States, 218 F.2d 631 (2nd Cir. 1955); Atlantic Transport Co. v. United States, 42 F.2d 583 (Ct. Cl.1930); The Strathnevis, 76 F. 855 (D.Wash.1896), and cases cited therein. Appellant argues that in these cases mechanical disability or weather conditions rendered further salvage efforts *impossible,* whereas no similar circumstances accompanied *St. Paul's* departure from the disabled *North America. St. Paul* was simply unable to take *North America* safely in tow.

The purpose of salvage awards and the abandonment rule dictate that we reject the contention that an award for a partial salvage be predicated upon the physical *impossibility* of further effort. Salvage awards encourage mariners to aid ships in distress. *See* Atlantic Transport Co v. United States, *supra,* 42 F.2d at 589. Similarly, the abandonment rule encourages those who do aid distressed vessels to maximize their efforts and to discourage them from quitting the salvage before doing all that reasonably can be done. But where more cannot reasonably be accomplished and the distressed ship is ultimately saved, it serves no purpose to deny an award.

Indeed, a contrary rule would discourage potential salvors from giving assistance if they thought that they could not complete the salvage by towing the distressed ship to port. Significantly for this case, the disincentive to give partial assistance to the best of one's ability does not depend on whether the obstacle to further aid is physical impossibility or, as here, impracticality due to the relative values of the vessels and the risks involved. We should not insert such dissuasion into the law.

The reasoning of the court in Atlantic Transport Co. v. United States, *id.,* did not depend on the fact that further salvage efforts were physically impossible:

> Where a vessel is in distress, in peril and danger, as here, or where the sea is rough and the weather unfavorable and the wind high, or where other facts which usually attend a vessel in distress exist, there is always a risk and danger in rendering assistance. It is easier for another vessel to stay out of the way or to pass by and not attempt to render assistance than it is to undertake the risk of doing so and incur a risk of injury to itself and a possible loss of life and cargo in connection with the effort. It has therefore been the policy of the courts, in order to encourage salvaging and the saving of life and property at sea, to be liberal in the matter of salvage where the vessel has made an honest effort to be of assistance or has joined with others in doing so, whether its efforts resulted in the final saving of the vessel or not, provided the failure of final success was not due to any lack of honest effort and willing purpose to assist. . . . "It is not necessary, in order to establish a claim to salvage, that the salvor should actually complete the work of saving the property at risk. It is sufficient if he endeavor to do so, and his efforts have a *causal* relation to the eventual preservation of it."

The court's reasoning supports an award under the circumstances of this case.

Of course, the salvor must show that it did what it reasonably could do and that his effort had "a causal relation to the eventual preservation of" the ship. But this is a factual question to be resolved by the trier of fact. The district court apparently agreed with appellees that *St. Paul* "made an honest effort to be of assistance," that she did all that she reasonably could do under the circumstances, and that she did not "abandon" *North America*. I cannot conclude that this finding is "clearly erroneous."

HUFSTEDLER, Circuit Judge (dissenting):

The crew of the Saint Paul performed ably and courageously in rescuing crewmen from the North America and in boarding her later in an attempt to salvage the vessel and her cargo. But our admiration for the men of the Saint Paul is not a substitute for evidence that the efforts of the boarding parties meaningfully contributed to the ultimately successful salvage by the tug Malie.

The key district court findings were that the boarding parties closed doors and portholes in the after accommodations and that without that action seawater would have entered the vessel through these apertures in such quantities that the vessel could have sunk before the Malie reached her. No one testified that anyone closed portholes. The porthole finding is based solely on DiColo's unsworn statement in Italian annexed to his deposition. The Italian statement was accompanied by an English translation that does not mention portholes. Porthole closing entered the case for the first and only time when plaintiff's in-court translator was trying to interpret DiColo's unsworn statement. Of course, the DiColo statement was in-

admissible hearsay even if the translator correctly interpreted it, a dubious assumption under the circumstances. Plaintiffs do not question its hearsay character; rather, they argue that defendant waived objection when it failed to object upon the initial offer of the document. The document was offered, along with a number of other documents, under a single number before any testimony was taken. Defendant's counsel reserved the right to correct the translation. After plaintiff's translator testified, defendant's counsel moved to strike the unsworn statement, and the motion was denied. The motion should have been granted. On these facts, no predicate exists for a waiver of the hearsay objection.

Testimony is in the record that the boarders closed one or more of the poop house doors. For two reasons the door closing episode cannot sustain the district court's further finding that the boarding crew's activities contributed to salvaging the vessel: first, neither the plaintiff's expert nor the court attempted to decide what effect door closing would have had on the vessel if portholes had not also been closed;[1] second, no substantial evidence, direct or circumstantial, supported an inference that the amount of water that was prevented from entering the vessel through the closing of one or more doors in the poop house could have been enough to sink the vessel.

Entirely apart from these deficiencies in the evidence, the Saint Paul is foreclosed from any recovery because she abandoned the North America. The Saint Paul conducted vigorous and successful efforts in rescuing the crew of the North America. In contrast, her attempt, after the crew were rescued, to salvage the vessel was brief, sporadic, and ineffectual. She did not have adequate equipment to make more than a passing try to salvage the North Ameri-

1. Mr. Walsh, the plaintiff's expert witness, based his opinion that the plaintiff's efforts contributed to the salvage upon hypothetical questions. When the facts in a hypothetical are not supported by the record, the foundation for the expert's opinion obviously collapses.

ca. After her insufficient towline parted, she gave up any further salvage operations and left. Her departure was voluntary; she was not dismissed, superseded, or disabled by her salvage attempt. She is not to be criticized for deciding that the risks to herself were too great to undertake any further salvage efforts, but neither is she entitled to a salvage award after she voluntarily abandoned the North America. The district court's finding that she did not abandon the vessel is unsupported by the record and is thus clearly erroneous.

The important purposes served by salvage awards and the abandonment rule are impaired, not promoted, by permitting those whose contributions to ultimate salvage are as slight as those performed by the Saint Paul to share in the salvage award. Heroic efforts to salvage are not likely to be made by salvors knowing that any ultimate bounty will be shared handsomely with any potential salvage claimant who made any fleeting effort toward salvage.

I have no occasion to reach any of the other issues. I would reverse.